[No. B141040. Second Dist., Div. One. Aug. 2, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
JAVONTIE ELAM, Defendant and Appellant.

**COUNSEL**

Tara M. Mulay, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Victoria Bedrossian Wilson and Michael W. Whitaker, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

### SPENCER, P. J.—

#### INTRODUCTION

Defendant Javontie Elam appeals from a judgment entered after a jury convicted him of assault with intent to commit a sexual felony, forcible oral copulation (Pen. Code, § 220), one count of misdemeanor or felony sexual battery (*id.*, § 243.4, subd. (a)) and one count of misdemeanor sexual battery (*id.*, subd. (d)(1)). Defendant admitted he previously had been convicted of two serious or violent felonies (*id.*, §§ 667, 1170.12) for which he had served prison terms within the meaning of Penal Code section 667.5, subdivision (b). After denying defendant's request to strike a prior conviction, the trial court sentenced defendant to state prison for the term prescribed by law. We reverse the judgment.

#### STATEMENT OF FACTS

While Darlene H. was working with defendant as an usher at the Music Center on January 5, 1999, defendant placed his hand on Darlene's breasts. She said, "No, I don't do that. I don't play like that." She elbowed defendant to remove his hand. Defendant acted as if it were a joke, then walked away. On the following day, defendant called Darlene a bitch. She reported the incident to her supervisor.

On June 26, 1999, Sirena T. was waiting in the parking lot with Diana and Felipe Perez for their rides after finishing work at the Hollywood Bowl. Defendant joined the group. The Perezes left when their ride arrived. Sirena and defendant talked a bit about work, then walked to the Promenade area of the Hollywood Bowl. They sat in box seats, facing each other.

Defendant put his hand between Sirena's legs, over her clothing. He told her she had a nice body. Sirena told him that what he was doing was not right. She said she had to go home. Defendant had unzipped his trousers and pulled out his penis. He placed Sirena's left hand on his penis, then rubbed his penis with her hand. He grabbed her right forearm and tried to pull her down onto her knees. He told her to get on her knees and perform oral copulation on him. The force defendant applied to her forearm caused a bruise. Sirena told defendant again that what he was doing was not right. She rose and walked down the aisle toward the exit.

Defendant followed Sirena. He grabbed her shoulders from behind, pulled her towards him and began rubbing her breasts. He also fondled her buttocks. Defendant had pulled down his trousers and tried to pull down her

pants. Sirena's cellular telephone rang. She pushed defendant away and attempted to speak to her mother on the cellular telephone. Defendant grabbed her again, placed her left hand on his penis and told her to make it hard. Sirena pulled away again and hurried down the hill to meet her mother. Defendant followed her. He told her, "This will be between you and me." She saw him walk towards some bushes as she neared her mother's car.

Sirena's mother, Catherine S., had attempted to reach Sirena several times on her cellular telephone after arriving at the Hollywood Bowl. Sirena eventually answered the telephone. Catherine S. told Sirena to meet her in the Plaza. When Sirena appeared, she seemed to be in a great hurry. After entering the car, Sirena curled up in a ball. She did not speak.

Sirena's grandmother, Maxine T., had accompanied Catherine S. to the Hollywood Bowl. As Sirena hurried down the hill, Maxine T. saw someone with dark hair, who was wearing an usher's uniform, walking behind Sirena. The person turned and disappeared into some bushes.

Sirena did not tell her mother or grandmother what had happened. She just wanted to sleep. When she arrived home, she showered, then went to bed.

When Sirena returned to work on the following day, she reported defendant's conduct to Casey Williams (Williams), an assistant supervisor of defendant and Sirena's. After Sirena reported defendant's June 26 conduct to him, Williams went to his supervisor, Daniel Rothschild (Rothschild). Sirena told Rothschild about the June 26 incident with defendant. Rothschild took Sirena to his supervisor, Alise Brown.

A week earlier, Williams had a conversation with defendant during which defendant said he had heard from "some guy" that "[i]f you play with [Sirena's genitals], she will [perform oral copulation]." Believing this was disrespectful, Williams gave defendant an odd look.

On the evening of June 27, when defendant learned that Sirena had been talking to people about his conduct, he became angry. He told Diana Perez, "Oh, that lying bitch."

Sirena told Los Angeles Police Officer Timothy Cleary, the first police officer to whom she spoke about this incident, that defendant had unzipped his trousers, taken out his penis, grabbed her arm, tried to force her to touch his penis and told her to make it hard. She made the same statements to Williams. She did not state that defendant pushed her hand down into his trousers. Sirena also related the incident to Los Angeles Police Officer Ed Tom and Detective Joe.

Officer Cleary interviewed Sirena regarding this incident. She related what had happened to her. Her account included a statement that her coworker, defendant, had grabbed her from behind, turned her towards him, pulled down his trousers, grabbed her right forearm and forced her to touch his penis. He told her to make it hard. She also stated that she was able to get away, but defendant followed her. He grabbed her again and touched her breasts, after which she once again escaped.

Officer Cleary observed a one-half inch by one-half inch circular bruise on Sirena's right inner forearm. The bruise was black and blue, "as if someone had grabbed her arm." The bruise appeared relatively fresh. It had not begun to fade or turn yellow.

*Defense*

Defendant has four prior felony convictions. He had been in alcohol and drug rehabilitation in 1995. He had been sober for six years. He stopped committing crimes after becoming sober.

Defendant had worked as an usher at the Hollywood Bowl since May 1999. He worked evenings while attending Los Angeles City College during the day. He aspired to be a juvenile delinquency counselor.

Defendant worked with Sirena on the evening of June 26. After the performance ended, defendant went to the parking lot to catch a bus. He saw Sirena and the Perezes waiting for their rides. Defendant chatted with them for 15 minutes. After the Perezes left, defendant talked to Sirena for approximately 10 minutes. Defendant then walked back up the hill. He intended to speak with Emily, who handled the payroll, for his check was incorrect. Sirena followed him for a short distance but then stopped to talk to a friend.

Defendant never touched Sirena. He is a homosexual who has not had sex with a woman for 17 years. While in jail, defendant was placed in a special unit for homosexual men.

## CONTENTS

### I

Defendant contends the trial court erred prejudicially in failing to instruct the jury sua sponte on the meaning of force in relation to the offense of assault with intent to commit forcible oral copulation.

## II

Defendant further contends the trial court erred prejudicially in failing to instruct the jury sua sponte on the meaning of the terms "duress" and "menace."

## III

Defendant asserts the trial court erred prejudicially in failing to instruct the jury sua sponte on the lesser included offense of simple assault as an alternative to assault with intent to commit forcible oral copulation.

## IV

Defendant avers there is insufficient evidence to support his felony sexual battery conviction and, as a consequence, the matter must be remanded for resentencing.

## V

Defendant further avers the trial court erred prejudicially in failing to instruct the jury on the lesser included offense of misdemeanor sexual battery and in failing to give a unanimity instruction, CALJIC No. 17.01, with respect to the misdemeanor or felony sexual battery.

## VI

Defendant asserts the trial court erred prejudicially in instructing the jury with CALJIC No. 17.41.1.

## VII

Finally, defendant contends the trial court erred prejudicially in removing Juror No. 3.

## DISCUSSION

## I

Defendant contends the trial court erred prejudicially in failing to instruct the jury sua sponte on the meaning of force in relation to the offense of assault with intent to commit forcible oral copulation. The contention lacks merit.

The trial court must give instructions, even in the absence of a request, on all general principles of law " ' "closely and openly connected

with the facts before the court, and which are necessary for the jury's understanding of the case." ' " (*People v. Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311], disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 200-201 [47 Cal.Rptr.2d 569, 906 P.2d 531]; accord, *People v. Montoya* (1994) 7 Cal.4th 1027, 1047 [31 Cal.Rptr.2d 128, 874 P.2d 903]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1311 [18 Cal.Rptr.2d 796, 850 P.2d 1].) This necessarily includes correct instruction on all essential elements of the charged offense. (*Wickersham*, *supra*, at p. 323.)

■ The trial court also has a sua sponte duty to define for the jury any term having a technical meaning peculiar to the law. (*People v. Howard* (1988) 44 Cal.3d 375, 408 [243 Cal.Rptr. 842, 749 P.2d 279]; *People v. Pruett* (1997) 57 Cal.App.4th 77, 81 [66 Cal.Rptr.2d 750].) As noted in *Peoplev . Estrada* (1995) 11 Cal.4th 568, 574 [46 Cal.Rptr.2d 586, 904 P.2d 1197], a word or phrase has a technical, legal meaning that requires clarification only if it "has a definition that *differs* from its nonlegal meaning." (Italics in the original.)

■ The force necessary in sexual offense cases is " ' "physical force substantially different from or substantially in excess of that required" ' " for the commission of the sexual act. (*People v. Senior* (1992) 3 Cal.App.4th 765, 774 [5 Cal.Rptr.2d 14]; accord, *People v. Mom* (2000) 80 Cal.App.4th 1217, 1224 [96 Cal.Rptr.2d 172].) One nonlegal meaning of force is "to press, drive, attain to, or effect as indicated *against resistance* . . . by some positive *compelling* force or action." (Webster's 3d New Internat. Dict. (1993) p. 887, col. 2, italics added.) Another is "to achieve or win by strength in struggle or violence." (*Ibid.*) These definitions do not differ in any significant degree from the legal definition. It thus is doubtful whether the court ever has a sua sponte duty to define "force" in a sexual offense case containing the element that it be accomplished against the will of the victim. (But see *People v. Pitmon* (1985) 170 Cal.App.3d 38, 52 [216 Cal.Rptr. 221].)

In any event, defendant was not charged with forcible oral copulation but with assault with *intent* to commit forcible oral copulation. It is settled that " ' "[t]o support a conviction for . . . [such an offense], the prosecution must prove the assault and an intent on the part of the defendant to use whatever force is required to complete the sexual act against the will of the victim." ' " (*People v. Greene* (1973) 34 Cal.App.3d 622, 648 [110 Cal.Rptr. 160].) The jury therefore was not charged with determining whether defendant applied physical force substantially different from or greater than that necessary to obtain oral copulation, but only with determining whether his acts demonstrated an intent to use that degree of force necessary to complete the act

against Sirena's will. For this reason, too, no special instruction on force was necessary.

## II

Defendant further contends the trial court erred prejudicially in failing to instruct the jury sua sponte on the meaning of the terms "duress" and "menace." This contention is equally meritless.

We need not decide whether the definitions of "duress" and "menace" found in Penal Code section 261, subdivisions (b) and (c), apply to other sexual offenses. The statutory definitions are the mere codification of common dictionary definitions.

Subdivision (b) of Penal Code section 261 defines "duress" as "a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted." A common dictionary meaning of "duress" is "stringent compulsion by threat of danger, hardship, or retribution . . . : Coercion." (Webster's 3d New Internat. Dict., *supra*, p. 703, col. 2.) Another common meaning is "compulsion or constraint by which a person is illegally forced to do or forbear some act by . . . physical violence to the person or by threat of such violence, the violence or threat being such as to inspire a person of ordinary firmness with fear of serious injury to the person . . . [or] reputation." (*Ibid.*) These common dictionary definitions of "duress" do not differ significantly from the statutory definition.

Subdivision (c) of Penal Code section 261 defines "menace" as "any threat, declaration, or act which shows an intention to inflict an injury upon another." The common dictionary meaning of "menace" is "a show of intention to inflict harm"; "a threatening gesture, statement, or act." (Webster's 3d New Internat. Dict., *supra*, p. 1409, col. 3.) Again, the common meaning of "menace" does not differ significantly from the statutory definition.

As noted in part I, *ante*, the trial court has a sua sponte duty to define for the jury only a term having a technical meaning peculiar to the law. (*People v. Howard, supra,* 44 Cal.3d at p. 408; *People v. Pruett, supra,* 57 Cal.App.4th at p. 81.) To have such a meaning, the legal definition must differ from the common one. (*People v. Estrada, supra,* 11 Cal.4th at p. 574.) Inasmuch as the statutory definitions of "duress" and "menace" do not differ significantly from the nonlegal, common meanings of those words, the trial court had no sua sponte duty to instruct the jury on the definitions of duress and menace.

In any event, there was no evidence from which the jury could have found that defendant assaulted Sirena with the intent of applying duress or menace sufficient to obtain oral copulation as opposed to the intent to use such force. The failure to define "duress" and "menace" therefore could not have harmed defendant.

## III

Defendant asserts the trial court erred prejudicially in failing to instruct the jury sua sponte on the lesser included offense of simple assault as an alternative to assault with intent to commit forcible oral copulation. We disagree.

"An assault is an unlawful attempt, coupled with the present ability, to commit a violent injury on the person of another, or in other words, it is an attempt to commit a battery[, defined as] 'any willful and unlawful use of force or violence upon the person of another.' " (*People v. Rocha* (1971) 3 Cal.3d 893, 899 [92 Cal.Rptr. 172, 479 P.2d 372]; *People v. Lathus* (1973) 35 Cal.App.3d 466, 470 [110 Cal.Rptr. 921].) It requires "the general intent to willfully commit a battery, an act which has the direct, natural and probable consequences, if successfully completed, of causing injury to another." (*People v. Brown* (1989) 212 Cal.App.3d 1409, 1419 [261 Cal.Rptr. 262].) Inasmuch as assault with intent to commit forcible oral copulation is merely a simple assault committed with the specific intent to force the victim to commit oral copulation (*People v. Greene, supra*, 34 Cal.App.3d at p. 648), simple assault is a lesser offense necessarily included in the greater offense.

The court must instruct the jury with respect to every defense theory of the case that is supported by substantial evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 157 [77 Cal.Rptr.2d 870, 960 P.2d 1094]; *People v. Flannel* (1979) 25 Cal.3d 668, 684-685 [160 Cal.Rptr. 84, 603 P.2d 1].) Evidence is substantial if a reasonable jury could find it persuasive (*People v. Barton, supra*, 12 Cal.4th at p. 201, fn. 8) and therefore conclude " ' "that the particular facts underlying the instruction did exist" ' " (*People v. Ceja* (1994) 26 Cal.App.4th 78, 85 [31 Cal.Rptr.2d 475]).

There is no evidence in this case justifying an instruction on simple assault. Defendant relies on Officer Cleary's testimony for such evidence, but his reliance is misplaced.

Officer Cleary's testimony had three purposes. First, to establish that Sirena had stated consistently, from the beginning, that defendant unzipped

his trousers, exposed his penis and forced her to touch it. Second, to establish that she had stated consistently, from the beginning, that he also grabbed her and touched her breasts. Third, to corroborate Sirena's testimony that he grabbed her right forearm with sufficient force to create a large bruise. During cross-examination, defense counsel had challenged Sirena's credibility forcefully in these three areas.

Officer Cleary was not asked whether Sirena had related to him defendant's attempt to force her to perform oral copulation. Her statements to him therefore are not inconsistent with her trial testimony, except to the extent that she told Officer Cleary defendant grabbed her right arm and forced her to touch his penis after he grabbed her from behind and turned her around to face him. She testified at trial that defendant grabbed her left hand on that occasion. This is a minor inconsistency. Right arm or hand, left hand—it makes no real difference. What is significant is that Sirena's statement to Officer Cleary is not inconsistent with defendant earlier having grabbed her right arm to force her to her knees when they were seated in the box seats. It is equally significant that Sirena did not tell Officer Cleary that defendant bruised her arm during the penis-touching incident. Inasmuch as there is no inconsistent testimony upon which the jury could seize to conclude that defendant did not intend to force Sirena to perform oral copulation but did assault her, there is no evidentiary support for an instruction on simple assault.

### IV

■ Defendant avers there is insufficient evidence to support his felony sexual battery conviction and, as a consequence, the matter must be remanded for resentencing. We agree this conviction is unsupported by the evidence, but disagree as to the need for remand.

■ In assessing the sufficiency of the evidence to sustain a conviction, this court must view the entire record, including all reasonably deducible inferences, in the light most favorable to the judgment. The conviction will be upheld if it is supported by substantial evidence, i.e., evidence that is credible and of solid value. (*People v. Osband* (1996) 13 Cal.4th 622, 690 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People v. Cain* (1995) 10 Cal.4th 1, 39 [40 Cal.Rptr.2d 481, 892 P.2d 1224].) It is only when the evidence, so viewed, would not permit any reasonable trier of fact to have found the defendant guilty beyond a reasonable doubt that the judgment will be reversed. (*Osband, supra*, at p. 690.)

■ Sexual battery under Penal Code section 243.4, subdivision (a), which can be either a misdemeanor or a felony, requires that a person

"touch[] an intimate part of another person while that person is unlawfully restrained by the accused . . . and . . . the touching is against the will of the person touched and is for the purpose of sexual arousal, sexual gratification, or sexual abuse . . . ." As used in this subdivision, the word "touch" means "physical contact with the *skin* of another person whether accomplished directly or through the clothing of *the person committing the offense*." (*Id.*, subd. (e), italics added.) " 'Intimate part' " means "the sexual organ, anus, groin, or buttocks of any person, and the breast of a female." (*Id.*, subd. (f)(1).) In other words, to be guilty of this form of sexual battery, defendant must have touched the *skin* of *Sirena's* sexual organ, anus, groin, buttocks or breast.

The prosecutor argued and the court accepted that it was sufficient for sexual battery that defendant forced Sirena's hand to touch his penis. They were mistaken. As defined, the term "intimate part" does not include the victim's hand. Moreover, it is the *perpetrator* who must touch the victim's intimate part, not the other way around.

The People now argue that the jury readily could infer skin-to-skin contact from defendant's attempt to remove Sirena's pants or her statement to a police officer that defendant fondled her buttocks. There is no evidence that defendant touched the *skin* of Sirena's buttocks when he attempted to pull down her pants or at any other time. There also is no evidence that he touched the skin of her breasts. Given the dearth of evidence, this sexual battery conviction must be reversed. No reasonable jury could have found the defendant guilty as charged. (*People v. Osband, supra,* 13 Cal.4th at p. 690.)

Defendant additionally argues that reversal mandates a remand for resentencing, in that the trial court well might view his request to strike a prior conviction differently absent the misdemeanor or felony sexual battery. In view of the conclusion we reach in part VII, *post*, we need not address this argument.

V

Defendant further avers the trial court erred prejudicially in failing to instruct the jury on the lesser included offense of misdemeanor sexual battery and in failing to give a unanimity instruction, CALJIC No. 17.01, with respect to the misdemeanor or felony sexual battery charge. Inasmuch as defendant's felony conviction of sexual battery must be reversed, we need not address the merits of these issues.

VI

Defendant asserts the trial court erred prejudicially in instructing the jury with CALJIC No. 17.41.1. He has waived the assertion.

The trial court instructed the jury with CALJIC No. 17.41.1 that "[t]he integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment, or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation."[1]

Defendant argues that CALJIC No. 17.41.1 infringes upon a jury's right to nullify, thereby serving as the conscience of the community. In defendant's view, this denies him his right to a jury trial within the meaning of the Sixth Amendment to the United States Constitution. He also argues that CALJIC No. 17.41.1 hampers jurors' candid exchange of views by threatening intrusion on the privacy of jury deliberations, and it facilitates coercion of minority jurors by the majority. This, he maintains, violates due process of law.

Defendant raised no objection in the trial court to the jury's instruction with CALJIC No. 17.41.1. His failure to do so waives any claim of error on appeal unless CALJIC No. 17.41.1 affected his substantial rights. In our view, it did not.

The Supreme Court has recently addressed the concept of jury nullification within the context of a trial court's excusing a juror for failure to follow the law. In *People v. Williams* (2001) 25 Cal.4th 441 [106 Cal.Rptr.2d 295, 21 P.3d 1209], the court noted that it was aware of no cases holding "that a trial court violates the defendant's right to a jury trial by excusing a juror who refuses to follow the law." (*Id.* at p. 449.) While, "as a practical matter, the jury in a criminal case may have the ability to disregard the court's instructions in the defendant's favor without recourse by the prosecution[, this] does not diminish the trial court's authority to discharge a juror who, the court learns, is unable or unwilling to follow the court's instructions." (*Ibid.*)

The court observed that "[i]t long has been recognized that, in some instances, a jury has the ability to disregard, or nullify, the law." (*People v. Williams, supra,* 25 Cal.4th at p. 449.) It can acquit a defendant despite evidence establishing guilt. (*Ibid.*) It may render inconsistent verdicts. (*Ibid.*) The jury's " ' "assumption of a power which they had no right to exercise, but to which they were disposed through lenity" ' " is not subject to review or challenge by the prosecution. (*Ibid.*)

---

[1]The propriety of CALJIC No. 17.41.1 currently is pending before the California Supreme Court (*People v. Engelman,* review granted Apr. 26, 2000, S086462; *People v. Taylor,* review granted Aug. 23, 2000, S088909).

Nonetheless, " ' " 'it is still the right of the court to instruct the jury on the law, and the duty of the jury to obey the instructions.' " ' " (*People v. Williams, supra,* 25 Cal.4th at p. 451.) This has long been the law established by both the United States and the California Supreme Courts. (*Id.* at pp. 451-456.)

It also has been the law that the trial court is not required to instruct the jury on its power of nullification or permit the jury to disregard the law. (*People v. Williams, supra,* 25 Cal.4th at p. 455.) Rather, it is proper for the trial court to instruct the jury on its obligation to follow the instructions given to it and to discharge a juror who refuses to do so. (*Id.* at p. 461.)

The directive set forth in CALJIC No. 17.41.1 to notify the court if a juror refuses to deliberate or expresses an intent to disregard the law or to use any improper basis, such as punishment, in reaching a verdict is a vehicle for ensuring that jurors comply with their duties. CALJIC No. 17.41.1 does nothing more than remind jurors of their obligation to follow the instructions given to them, which is absolutely proper. (*People v. Williams, supra,* 25 Cal.4th at p. 452.) The Supreme Court's opinion in *Williams* makes it clear that CALJIC No. 17.41.1 is consistent with the long-established law that the trial court has the right to instruct the jury on the law, and the jury has the duty to obey its instructions. (*Williams, supra,* at pp. 451-452.)

Moreover, CALJIC No. 17.41.1 neither interferes with a defendant's right to a jury trial nor has a chilling or coercive effect on juror deliberations. Each juror takes an oath to " 'well and truly try the cause now pending before this court, and a true verdict render *according only to the evidence presented to you and to the instructions of the court.*' " (Code Civ. Proc., § 232, subd. (b), italics added.) The Supreme Court acknowledged in *People v. Cleveland* (2001) 25 Cal.4th 466 [106 Cal.Rptr.2d 313, 21 P.3d 1225], the companion case to *Williams,* that "caution must be exercised in determining whether a juror has refused to deliberate." (*Id.* at p. 475.) Questioning jurors about their deliberations can have an effect on the deliberations themselves, making the jurors reluctant to express their opinions freely. (*Id.* at p. 476.) "The need to protect the sanctity of jury deliberations, however, does not preclude reasonable inquiry by the court into allegations of misconduct during deliberations." (*Ibid.*) CALJIC No. 17.41.1 enables the trial court to conduct a reasonable inquiry when a possibility of misconduct exists. It does nothing more than remind the jurors of their oath and obligation, then enlist them in aiding the detection of oath violators. There is nothing chilling or coercive about reminding the jurors of their obligations. (*People v. Keenan* (1988) 46 Cal.3d 478, 536 [250 Cal.Rptr. 550, 758 P.2d 1081].)

CALJIC No. 17.41.1 does not speak of reward for informing the court of misconduct or of punishment for failing to do so. It has no tendency to

influence a case in favor of either side or seek disclosure of a juror's thoughts or idiosyncrasies. It does not impair jurors' ability to question the strength of the People's case.

In short, CALJIC No. 17.41.1 does not affect any fundamental rights. To the contrary, it is unobjectionable. Defendant therefore has waived any claim of error on appeal. (*People v. Guiuan* (1998) 18 Cal.4th 558, 570 [76 Cal.Rptr.2d 239, 957 P.2d 928].)

## VII

Finally, defendant contends the trial court erred prejudicially in removing Juror No. 3. We agree.

After half a day of deliberations, the court received a note from the foreperson, Juror No. 6, which read, "There is a perception problem with Juror No. 3. Possibly a language understanding. Help." In the presence of counsel, the court summoned Juror No. 6 to "clarify the nature of the problem."

Juror No. 6 believed Juror No. 3 had problems with the English language. Juror No. 6 also stated that he or she did not believe Juror No. 3 understood the "process, maybe the law here. We are having trouble understanding him, and we feel he is having problems trying to explain different points of view. We don't think he is grasping the big picture." Given the "concepts we have tried to present him with in deliberating," Juror No. 6 was "not certain [Juror No. 3] has a full understanding of what we are doing here."

After speaking to Juror No. 6, the court summoned Juror No. 3. He acknowledged having "some" difficulty with the English language, "a little bit." He had been in school in California for almost a year. He had earned an associate of arts degree in English from Glendale Community College, however. He thought he could manage. He had no problem understanding the testimony. The court was having "a little trouble" understanding Juror No. 3.[2] He acknowledged that he had a pronounced accent. While his first language was not English, he had grown up speaking English and had spoken English continuously while serving in the United States Navy.[3] Before coming to California, Juror No. 3 had lived in Italy, where he

---

[2]We note, however, that the court *could* understand Juror No. 3 and that the court reporter had no difficulty transcribing his statements. The first occasion on which the court indicated some difficulty followed Juror No. 3's response of "No," to a question. This suggests the court may have had more difficulty hearing than understanding Juror No. 3.

[3]We may infer logically that one requires a reasonable degree of proficiency in English to serve in the United States Navy. One also must master an arcane vocabulary.

primarily spoke English. When the court asked Juror No. 3 his opinion of why the other jurors were concerned about an inability to communicate, he answered, "Maybe we see the case differently." In his opinion, Juror No. 3 did not have a significant language problem. He understood the instructions. He was able to participate in discussions.[4]

The court then summoned the remaining jurors, one by one. Juror No. 1 believed that Juror No. 3 had "a language problem." Juror No. 1's primary complaint, however, was that "[w]e may be discussing a particular topic or item, an issue, we can all agree to that particular item. Five or ten minutes down the line, we are bringing it up again and his mind will be completely changed. I am not sure if he is actually understanding . . . the elements of the law."

Juror No. 2 felt there might be "a language problem." Juror No. 2 could understand what Juror No. 3 was saying, however. In Juror No. 2's view, Juror No. 3 did not "understand some of the specifics of the law, the way it is being read." Juror No. 3 frequently changed his mind. Juror No. 2 was concerned that Juror No. 3 might not understand what was going on in discussions, noting that Juror No. 3 would "basically block out" "some of the evidence being shown." He would say "he doesn't want to hear that." As an example, "[t]here is circumstantial evidence. He feels that is not applicable at all. If it is not tangible or concrete, then it is not admissible." Juror No. 2 believed Juror No. 3 understood the instructions, "but chooses not to work with them. . . . [H]e . . . has this mind set this is the way it is to be and not letting other pieces of evidence show certain things."

Juror No. 4 thought there was a language problem, but it possibly could be a problem with understanding the issues. Juror No. 4 complained that Juror No. 3 "vacillat[ed] back and forth." "There [are] points of law that have been read and then the person says they can't accept that. We state, but this is the law, we have to go by the law."

Juror No. 5 expressed the opinion that Juror No. 3's understanding of the English language was a problem, particularly with respect to comprehension. "[N]one of us feel he understands what we are saying." Juror No. 5's main complaint, however, was that for Juror No. 3, "the personalities, everything involved is very strong in his opinion." "I am not sure if he doesn't feel very loyal to the victim and can't listen to any other information that is presented."

Juror No. 7 was not sure if there was a language problem, although it was probable that Juror No. 3 was having difficulty understanding the instructions. It was not clear to Juror No. 7 whether Juror No. 3 was "keeping up

---

[4]The appendix recites Juror No. 3's entire exchange with the court.

with the discussion." Juror No. 7 thought it probable that the discussion was moving too rapidly for Juror No. 3's grasp of the English language. Juror No. 7 also complained, however, that Juror No. 3 "keeps changing his mind." He would agree "on one instance and then, later on, he comes back with . . . a different opinion." This was frustrating, for it was "like we are all starting over again."

In Juror No. 8's view, there "seem[ed] to be a potential difficulty in understanding and speaking about subjects that are involved with the trial." Juror No. 8 believed it was a problem with understanding which witness "said what and understanding what was said." It was clear to Juror No. 8 that Juror No. 3 understood more than half of the discussion but not all of it.

Juror No. 9 believed Juror No. 3 was "really having a hard time comprehending." "I notice he gets the overall idea. When you get down to certain words or certain phrases, he doesn't understand what we are saying." He would repeat back an explanation given him as something completely different. Sometimes Juror No. 3 contradicted himself. "The more we talk, the more I can see he just doesn't understand. There are certain things that he would take a real hard stand on and then he would change it. He was getting confused. He just didn't seem to grasp the law . . . ."

Juror No. 10 believed there was a language problem. Sometimes Juror No. 3 had difficulty understanding some words.

In Juror No. 11's view, "there is a definite problem with understanding and comprehension. . . . We are talking about one thing and he is talking about something completely different." Juror No. 11 was "not sure whether he really understands what we are saying when we talk about credibility or . . . about believability." Juror No. 11 also complained, however, that "there is no logical reason for what [Juror No. 3] is saying." "He cannot give us a reason. No reason at all."

Juror No. 12 was "quite sure" there was a language problem. It appeared Juror No. 3 misunderstood, "sometimes, what the instructions say about guilt or non-guilt or what creates an offense and what doesn't create an offense." As to one offense, "he has already made up his mind . . . . He has made up his mind and that is it." While there might be some problem with misunderstanding the instructions, Juror No. 12 believed that if Juror No. 3 "understood wholeheartedly, without any reservations with no difficulty understanding, his answer would still be the same and he still would have the same feelings about the guilty or not guilty situation." Most significantly, Juror No. 12 stated that Juror No. 3 "is definitely aware of what is going on. They explained it to him. He explains his [viewpoint]. I think he understands."

After speaking to all of the jurors and hearing argument, the court discharged Juror No. 3, expressing concern that there was a language problem. "I fear that you may have overestimated your own abilities to understand all of these proceedings."

Penal Code section 1089 provides in pertinent part: "If at any time, whether before or after the final submission of the case to the jury, a juror . . . upon . . . good cause shown to the court is found to be unable to perform his duty, . . . the court may order him to be discharged and draw the name of an alternate, who shall then take his place in the jury box, and be subject to the same rules and regulations as though he had been selected as one of the original jurors." For this court to uphold the trial court's exercise of discretion in discharging a juror, the " 'juror's inability to perform as a juror " 'must appear in the record as a demonstrable reality.' " ' . . ." (*People v. Cleveland, supra*, 25 Cal.4th at p. 474, citations omitted.)

Insufficient command of the English language to allow full understanding of the words employed in instructions and full participation in deliberations clearly would render a juror "unable to perform his duty" within the meaning of Penal Code section 1089. The question is whether such an inability appears in the record before us " ' " " 'as a demonstrable reality.' " ' . . ." (*People v. Cleveland, supra*, 25 Cal.4th at p. 474, citations omitted.)

All of the jurors other than Juror No. 3 believed there was some language problem. Things often had to be explained more than once, creating difficulty in communicating. Some language difficulty is insufficient, however. If, with repeated explanations and discussions, Juror No. 3 could comprehend matters, then it is immaterial that he had a pronounced accent, his English was not the best and juror communication was not quick and easy. It was Juror No. 12's opinion that this was precisely the state of affairs. Communication was difficult but not impossible. Juror No. 3 clearly understood what was transpiring, but he had a different view of the law and the facts than did the other jurors. It was clear to Juror No. 8 that Juror No. 3 understood a great deal of the discussion.

The other jurors expressed opinions that Juror No. 3 had difficulty understanding their explanations and the instructions, or that he was confusing one person's testimony with another. A deeper look reveals that their opinions were based on his failure to *accept* their explanations or to interpret the instructions and evidence as they did, however.

Juror No. 6 based his or her conclusion that Juror No. 3 was not understanding the law fully on his reaction after the other jurors explained certain

concepts to him. That could be read as Juror No. 3's difference of opinion as readily as a lack of understanding. This was Juror No. 3's view of the situation, that he simply viewed the case differently than did the other jurors.

Juror No. 1's primary complaint was that "[w]e may be discussing a particular topic or item, an issue, we can all agree to that particular item. Five or ten minutes down the line, we are bringing it up again and his mind will be completely changed." In other words, as Juror No. 4 said, Juror No. 3 "vacillat[ed] back and forth." This, too, was Jurors Nos. 2, 7 and 9's complaint. Changing his mind could represent the fruits of further reflection as readily as confusion. Juror No. 3 rejected some evidence, "block[ing] it out." He had a different view of the value of circumstantial evidence, essentially considering it worthless. He disagreed with some points of law.

Juror No. 5's main complaint was that for Juror No. 3, "the personalities, everything involved is very strong in his opinion." "I am not sure if he doesn't feel very loyal to the victim and can't listen to any other information that is presented." Juror No. 11 complained that "there is no logical reason for what [Juror No. 3] is saying." "He cannot give us a reason. No reason at all."

The foregoing complaints do not necessarily demonstrate inadequate comprehension of the English language as opposed to legitimate disagreement over the meaning to be given certain instructions, interpretations of the law and evidence. They are closely akin to the complaints registered in *People v. Cleveland, supra,* 25 Cal.4th 466, which the Supreme Court found insufficient to justify discharge of a juror. (See *id.* at pp. 471-473, 485-486.)

As explained in *Cleveland,* "[t]he circumstance that a juror does not deliberate well or relies upon faulty logic or analysis . . . is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts . . . is not a ground for discharge." (*People v. Cleveland, supra,* 25 Cal.4th at p. 485.) A juror's inarticulateness in explaining his position likewise is not a ground for discharge. (*Id.* at p. 486.)

Moreover, it is noteworthy that the other jurors showed great impatience with Juror No. 3. The jury had deliberated less than three hours when the foreperson sent the complaint to the court. This suggests that 11 jurors reached agreement rather quickly, making the failure of the 12th juror to agree all the more annoying and frustrating. In such an atmosphere, it is more likely that majority jurors will attribute genuine differences of opinion to "language problems," or "lack of comprehension," where possible.

The record does not establish " 'as a demonstrable reality' " that Juror No. 3's language difficulties, as opposed to his failure to deliberate well, his reliance upon faulty logic or analysis and his disagreements over the law and the evidence, accounted for the difficult deliberations the jury was experiencing. It therefore does not establish " 'as a demonstrable reality' " that Juror No. 3 was unable to perform as a juror. (*People v. Cleveland, supra*, 25 Cal.4th at p. 485.) Necessarily, then, it was an abuse of discretion for the trial court to discharge Juror No. 3. The error requires reversal of the judgment. (*Id.* at p. 486.)

The judgment is reversed.

Mallano, J., concurred.

**VOGEL (MIRIAM A.), J.,** Dissenting.—To the extent the majority finds error with regard to the removal of Juror No. 3 (pt. VII, pp. 313-318), I dissent. In my view, the majority's conclusion ignores the record.

The foreman's note said "[t]here [was] a perception problem with Juror No. 3[, p]ossibly a language understanding. Help." When questioned by the court, the foreman (Juror No. 6) said the majority of the jurors felt that Juror No. 3 was "not understanding the process, maybe the law here. We are having trouble understanding him, and we feel he is having problems trying to explain different points of view. We don't think he is grasping the big picture."

When questioning Juror No. 3, the trial court was unable to understand several of the juror's answers and had to ask him to repeat himself. At one point, the court stated, "I am having a little trouble [understanding you]. You do have a pronounced accent." Juror No. 3 agreed, responding, "Yes, I have an accent" (although he insisted there was "no language problem"). Although the record is not clear, it appears that his primary language is Tagalog (he grew up in "Hawaii, the Philippines, [and] Guam," with Spanish-speaking parents). At the time of trial, Juror No. 3 had been in the United States only a year, before which he had been living in Italy where he spoke "mostly Italian, Spanish and English."

All of the other jurors thought there was a language problem.

Juror No. 1 said, "I believe there is a language problem." When the court explained that it needed to "distinguish between a situation where somebody understands, but disagrees with others, versus somebody who doesn't seem to understand," Juror No. 1 again said that Juror No. 3 "really doesn't understand . . . ."

Juror No. 2 said, "I believe it might be a language problem . . . . It is not getting across to him what we are speaking about . . . . I think he doesn't understand some of the specifics of the law, the way it is being read. . . . I don't think he understands it."

Juror No. 4 said, "I tend to think we maybe have a language problem, that type of thing . . . . I kind of think whether it is really a language issue or just a total misunderstanding of what we are here for. . . ."

Juror No. 5 said it was "definitely" a language problem, "[a]nd comprehension. . . . It becomes so frustrating because none of us feel he understands what we are saying. I'm not sure if this could have been detected when we were all questioned as jurors, but it is very obvious now. . . . I can't believe . . . he comprehends what occurred."

Juror No. 7 said "yes," Juror No. 3 had a language problem, and that the language problem affected Juror No. 3's ability to follow the court's instructions. Juror No. 7 thought the discussion was "probably" moving too fast for Juror No. 3's grasp of English.

Juror No. 8 believed "that it could be" a language problem, and that there "seem[ed] to be a potential difficulty to understanding and speaking about subjects that are involved with the trial." According to Juror No. 8, Juror No. 3's understanding of English was "above 50 percent. I know that more than half is being understood, but it is not 100 percent either."

Juror No. 9 said, "Juror No. 3 is really having a hard time comprehending. I think it is the language plus understanding the law. . . . The more we talk, the more I can see he just doesn't understand. There are certain things that he would take a real hard stand on and then he would change it. He was getting confused. . . . I notice he gets the overall idea. When you get down to certain words or certain phrases, he doesn't understand what you are saying. We would have to repeat ourselves, or he would talk back and it wouldn't be what we were saying. It would show that he didn't understand what we were saying in phrases or certain words."

Juror No. 10 said it was "a problem of communication. . . . Some language problem, I think, and some understanding of the words. Like what we are saying, I don't know if he knows the words that we are talking about sometimes, because it is like—it is—he has a hard time understanding it."

Juror No. 11 said "there is a definite problem with understanding and comprehension. It is extremely frustrating. We are talking about one thing

and he is talking about something completely different. We are not communicating at all. . . . I'm not sure whether he really understands what we are saying when we talk about credibility or we talk about believability. I don't think he is understanding. It is just really frustrating for us."

Juror No. 12 said, "I think Juror No. 3 really doesn't understand what he is trying to say." According to Juror No. 12, it was "sometimes" difficult for Juror No. 3 to keep up with the discussions, and he was "quite sure that" was because of Juror No. 3's problem with English. Juror No. 12 felt "there might be a problem with him expressing himself."

The trial court heard Juror No. 3 and could determine the extent of his accent and his ability to understand. With that knowledge and based on the other jurors' comments, the trial court found there was a substantial language problem and that Juror No. 3 had overestimated his own ability to understand the proceedings. In my view, the record amply supports the trial court's finding and the decision to replace Juror No. 3 with an alternate juror. (*People v. Cleveland* (2001) 25 Cal.4th 466, 474 [106 Cal.Rptr.2d 313, 21 P.3d 1225].)

A petition for a rehearing was denied August 22, 2001, and the opinion was modified to read as printed above.

APPENDIX

"THE COURT: . . . Good afternoon, sir. Take any seat, if you would. We have been joined now by Juror No. 3. The reason I have asked you to step out is because it has come to my attention that you may be having some difficulty with the English language. If this is true, we need to talk about it.

"JUROR NO. 3: I think there is some, yes. A little bit. I have been in school here almost a year now. I think I can manage.

"THE COURT: When you were listening to the trial, did you have difficulty with the testimony?

"JUROR NO. 3: No.

"THE COURT: I am sorry?

"JUROR NO. 3: No, Judge.

"THE COURT: You believe you understood everything?

"JUROR NO. 3: Yes.

"THE COURT: The other jurors are concerned, and I need to know if this is a problem for you.

"JUROR NO. 3: No, Judge. No, Ma'am.

"THE COURT: You mentioned that you have been going to school.

"JUROR NO. 3: Yes, Sir [sic].

"THE COURT: Can you tell me about that[?]

"JUROR NO. 3: I have taken—just graduated from Associate in Arts in English.

"THE COURT: An Associate—

"JUROR NO. 3: In Arts in English. Glendale Community College.

"THE COURT: I didn't hear the last part.

"JUROR NO. 3: Glendale Community College.

"THE COURT: Have you received your A.A. yet?

"JUROR NO. 3: Yes, Ma'am.

"THE COURT: How long have you been speaking English?

"JUROR NO. 3: Well, I was born here, but I grew up outside United States.

"THE COURT: Growing up, what did you speak?

"JUROR NO. 3: I was speaking different languages. In the Navy, we speaks English.

"THE COURT: Growing up, what language did you speak?

"JUROR NO. 3: English, Ma'am.

"THE COURT: Where did you grow up?

"JUROR NO. 3: I grew up Hawaii, Philippines, Guam.

"THE COURT: What did your parents speak?

"JUROR NO. 3: Spanish.

"THE COURT: You were in the military, if I recall?

"JUROR NO. 3: Yes, I was. Interim.

"THE COURT: You spoke English in the military?

"JUROR NO. 3: Yes.

"THE COURT: You have been back in the United States for how long?

"JUROR NO. 3: About a year now. More than a year.

"THE COURT: Before this year, where did you live?

"JUROR NO. 3: In Italy.

"THE COURT: What did you speak mostly?

"JUROR NO. 3: Mostly some Italian, Spanish and English. Mostly English.

"THE COURT: Are you taking these classes at Glendale because you want to improve your English?

"JUROR NO. 3: I took classes for English, yes.

"THE COURT: I am sorry?

"JUROR NO. 3: I took the classes in proper English.

"THE COURT: Is it possible that the jurors are having trouble understanding you? [¶] I am having a little trouble. You do have a pronounced accent.

"JUROR NO. 3: Yes, I have an accent.

"THE COURT: Do you think the other jurors are having trouble understanding you? Has that happened?

"JUROR NO. 3: I don't believe, Ma'am.

"THE COURT: Why do you think that they are concerned about their inability to communicate with you?

"JUROR NO. 3: Maybe we see the case differently.

"THE COURT: You think it is a difference of opinion?

"JUROR NO. 3: Yes.

"THE COURT: You don't think you have any language problem at all?

"JUROR NO. 3: No. No language problem.

"THE COURT: Have you reviewed the instructions that I sent in?

"JUROR NO. 3: We read it every time.

"THE COURT: Have you been reviewing that?

"JUROR NO. 3: The foreman read to us.

"THE COURT: Did you feel that you understood?

"JUROR NO. 3: Yes, Ma'am.

"THE COURT: Do you feel that you are able to participate in the discussions?

"JUROR No. 3: Yes, Ma'am."