Filed 6/11/13  P. v. Gant CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DARIUS GANT,<br><br>    Defendant and Appellant. | 2d Crim. No. B242212<br>(Super. Ct. No. BA372890)<br>(Los Angeles County) |

Darius Gant appeals from the judgment following his conviction for willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 187/664, subd. (a)), and possession of cocaine base for sale (Health & Saf. Code, § 11351.5). The jury found that he personally used a firearm causing great bodily injury in the attempted murder (Pen. Code, § 12022.53, subd. (d)), that the attempted murder was gang related (Pen. Code, § 186.22, subd. (b)), and that Gant had a prior drug conviction (Health & Saf. Code, § 11352). Gant was sentenced to life in prison with a 15-year minimum parole eligibility date for the attempted murder plus 25 years to life for the firearm enhancement. He received an eight-year concurrent sentence for the drug offense.

Gant contends that there was insufficient evidence to support the attempted murder conviction, the trial court erred in denying a mistrial after the victim suffered a seizure during his trial testimony, and that he was denied trial by a fair and impartial jury due to juror incompetence and misconduct. We affirm.

FACTS AND PROCEDURAL HISTORY

On the afternoon of June 2, 2010, Gant and victim Ralph Metcalfe were walking in opposite directions on Exposition Boulevard in Los Angeles, California. Gant was a member of the Rollin' 30s Harlem Crip gang whose territory borders on that of the rival Fruit Town Brims gang. Metcalfe was not and had never been a member of any gang.

When Gant approached Metcalfe, he asked Metcalfe if Metcalfe knew where to get some "weed." Metcalfe responded that he did not live in the area and did not know about buying weed. As the two men passed each other, Gant said "Harlem Crip" and started shooting at Metcalfe with a handgun when Metcalfe looked back. Gant shot Metcalfe several times causing serious injury. Metcalfe was able to crawl under a truck parked at the curb.

Metcalfe saw that Gant had several tattoos. He testified that he saw a "3" and "0" tattooed on Gant's forearms, and the letters "H" and "C" and a dragon elsewhere on his arms. He also testified that Gant had tattoos on his neck. Metcalfe identified Gant as the shooter at Gant's preliminary hearing and at trial.

Witness Mario Calderon testified that he heard gunshots while in his living room across the street. He then saw a man get into a small gold car and drive away. In a photographic lineup and at trial, Calderon identified Gant as the man he saw. He also identified Gant's gold car. Another witness identified Gant's car as resembling the car she saw drive away after the shooting.[1]

Gant offered an alibi defense, presented expert testimony on the unreliability of eyewitness testimony, and on the effects of epilepsy on memory. He also offered testimony that he did not purchase his gold car until two days after the shooting of Metcalfe.

---

[1] We do not summarize the facts of the drug conviction or evidence in support of the gang enhancement because no issues are raised on appeal regarding those matters.

*Substantial Evidence Supports Conviction*

Gant contends there was insufficient evidence to support his attempted murder conviction. He argues that the evidence identifying Gant as the shooter was so unreliable that it failed to constitute substantial evidence of guilt. We disagree.

"When the sufficiency of the evidence to support a conviction is challenged on appeal, we review the entire record in the light most favorable to the judgment to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' [Citation.] Unless it describes facts or events that are physically impossible or inherently improbable, the testimony of a single witness is sufficient to support a conviction. [Citation]" (*People v. Elliott* (2012) 53 Cal.4th 535, 585; see also *People v. Allen* (1985) 165 Cal.App.3d 616, 623.)

Here, victim Metcalfe positively identified Gant as the man who shot him at both the trial and preliminary hearing and also identified Gant in a photographic lineup a week after the shooting. Evidence shows that Metcalfe saw Gant face to face from a few feet away during daylight hours. Metcalfe's testimony was corroborated in substantial part by other witnesses. Although he did not see the shooting himself, witness Calderon testified that, seconds after the gunshots, he saw Gant get into a small gold car and drive away. Another witness testified that she saw a gold car drive away moments after the shooting.

Gant emphasizes contradictions and inconsistencies between Metcalfe's initial description of the shooter to the police and his trial testimony, and also notes that Metcalfe did not remember certain facts about the shooting. In police interviews shortly after the shooting, Metcalfe described Gant's tattoos somewhat differently from his trial testimony, and also described Gant as being about 5'11" and weighing about 195 pounds.

3

Gant was actually 5'7" tall and weighed 150 pounds. At one point, Metcalfe told police that Gant and another man in a photographic lineup both looked like the shooter.

Gant argues that these discrepancies and inconsistencies render the evidence of Gant's identity too unreliable to qualify as substantial evidence. We do not agree. The jury was aware of these inconsistencies and heard expert testimony regarding the reliability of eyewitness identifications when it unanimously found Gant guilty. On review, we may not substitute our judgment for that of the jury, reweigh the evidence or reevaluate witness credibility. (E.g., *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

*Mistrial Not Required After Witness Seizure at Trial*

Gant contends the trial court erred by not declaring a mistrial after victim Metcalfe suffered an epileptic seizure during his trial testimony. Gant argues that, due to jury sympathy, he was denied trial by an impartial and unbiased jury. We disagree.

A criminal defendant is entitled to trial by a fair and impartial jury. (*Irvin v. Dowd* (1961) 366 U.S. 717, 722; *People v. Nesler* (1997) 16 Cal.4th 561, 578.) The trial court must grant a motion for mistrial when a party's chances of receiving a fair trial have been irreparably damaged and cannot be cured by an admonition or instruction. (*People v. Dement* (2011) 53 Cal.4th 1, 39-40; *People v. Bolden* (2002) 29 Cal.4th 515, 555.) The court has considerable discretion in ruling on a mistrial motion because the prejudicial effect of a particular incident is "a speculative matter." (*Dement,* at pp. 39-40; *People v. Avila* (2006) 38 Cal.4th 491, 573.) Bias and prejudice must be shown as a "demonstrable reality." (*People v. Holt* (1997) 15 Cal.4th 619, 659.)

The day after Metcalfe suffered his seizure, the trial court questioned each of the jurors and alternates individually and alone. The court asked the jurors and alternates four questions: (1) What they thought had happened, (2) how they thought the incident would affect them, (3) could they evaluate Metcalfe's testimony in the same way as other witnesses, and (4) do they blame anyone for the incident. The jury was also informed that the shooting had nothing to do with Metcalfe's seizure.

Two of the jurors stated that the incident would or could affect their judgment in the case. Many of the remainder indicated sympathy for Metcalfe's medical

4

condition but that they could impartially evaluate his testimony and reach a verdict solely on the basis of the evidence. The trial court excused the two jurors who believed the seizure could affect their judgment, and denied Gant's request for a mistrial.

We conclude that Gant fails to show any prejudice from the seizure incident and that the trial court did not abuse its discretion by denying a mistrial. (See *People v. Wallace* (2008) 44 Cal.4th 1032, 1068.) The trial court carefully and extensively questioned each of the jurors and alternates and excused those who expressed doubt as to their impartiality. There is no question that all of the jurors emotionally reacted to the incident, but an emotional reaction to such an incident is not the equivalent of bias.

*No Showing of Prejudicial Jury Misconduct or Incompetence*

1. *Contentions and Standard of Review*

Gant contends that two jurors were incompetent to fulfill their duties as jurors, and that certain jurors committed acts of misconduct by improperly considering information extraneous to the evidence presented at trial. He argues that (1) Juror No. 2 was not competent to fulfill his duties due to mental illness, (2) Juror No. 7 was not competent to fulfill his duties due to an insufficient understanding of English, (3) Juror No. 7 improperly relied on a dictionary to look up the meaning of certain English words, (4) Juror No. 7 failed to deliberate, and (5) Juror No. 2 and Juror No. 5 improperly looked up an article on the Internet and conducted experiments during deliberations.

Gant raised these issues in an unsuccessful motion for a new trial. When an appellant reasserts claims previously raised in a new trial motion, the appellate court must conduct an independent examination of the proceedings to determine whether a miscarriage of justice occurred. (*People v. Ault* (2004) 33 Cal.4th 1250, 1261.) In doing so, the court employs the appellate standard of review applicable to the particular claim at issue. (*People v. Nesler, supra,* 16 Cal.4th at pp. 582-583.) In general, we review a trial court's ruling on a motion for a new trial under the abuse of discretion standard. (*People v. Thompson* (2010) 49 Cal.4th 79, 140.) Upon appeal from the denial of a new trial motion based upon jury misconduct, however, we defer to the trial court's factual findings if supported by substantial evidence but exercise de novo review of whether the

5

defendant's constitutional rights were violated by prejudicial misconduct. (*Ault,* at pp. 1261-1263; *People v. Gamache* (2010) 48 Cal.4th 347, 396.)

2. *Juror No. 2's Mental Condition*

Gant contends that Juror No. 2, the jury foreman, was not competent to fulfill his duties as a juror because he was mentally ill during trial. It is undisputed that Juror No. 2 was hospitalized in a psychiatric ward for 10 days starting 16 days *after* completion of trial and was hospitalized a second time for three days one month later. Gant argues that, based on these hospitalizations, Juror No. 2's mental illness must have existed during trial rendering him unable to deliberate rationally and fairly. We disagree.

A defendant has the right to a trial by jurors who are mentally competent and unbiased. (*Jordan v. Massachusetts* (1911) 225 U.S. 167, 176; *People v. Millwee* (1998) 18 Cal.4th 96, 144; *Church v. Capital Freight Lines* (1956) 141 Cal.App.2d 246, 248.) A person is deemed mentally competent to serve as a juror if he or she is "'[i]n possession of his or her natural faculties and of ordinary intelligence,'" and is able to understand the nature of the proceedings and deliberate rationally. (*Milwee*, at p. 144, fn. omitted.)

By way of analogy, Penal Code section 1089 permits the removal of a sitting juror for "good cause" which includes the inability to fulfill the duties of a juror due to misconduct or incompetence. (See *People v. Fuiava* (2012) 53 Cal.4th 622, 702, 711.) To remove a sitting juror, such misconduct or incompetence cannot be presumed and must appear on the record as a "demonstrable reality." (*Fuiava*, at p. 711; *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.)

There is no credible evidence that Juror No. 2 was mentally incompetent at the time of trial under any definition of competence. The record shows that Juror No. 2 was fully able to understand the evidence, understand the charged offenses, deliberate objectively--and serve as the jury foreman. (See *People v. Millwee, supra*, 18 Cal.4th at p. 144.)

In his own declaration, Juror No. 2 stated that he believed he developed a mental problem "as a result of this trial" and that his problems "began after the trial" and

6

that he believed they were caused by worry over a guilty verdict. He stated that he was hospitalized due to bizarre and inappropriate behavior after trial and took a three-week medical leave from work. While this declaration reveals emotional problems after trial, it does not indicate that he was impaired during trial. To the contrary, his candor indicates the opposite and his description of his actions as jury foreperson showed that he acted in a cogent, professional, and competent manner.

A declaration from Juror No. 3 stated that, at lunches during trial, Juror No. 2 acted "strangely" on one occasion, was "paranoid" about personal financial matters, and he talked about "some irrelevant things." Juror No. 3 also stated Juror No. 2 was a "little arrogant, rude, awkward, and he did not rub me the right way." None of these statements indicates that Juror No. 2 was mentally ill or incompetent to serve as a juror.

3. *Juror No. 7's Command of English Language*

Gant argues Juror No. 7's understanding of the English language was inadequate. We disagree.

To be eligible and qualified to serve as a juror, a person must be "possessed of sufficient knowledge of the English language." (Code Civ. Proc., § 203, subd. (a)(6).) To have such knowledge, a juror must be able to fully understand the testimony, argument and jury instructions, and participate in jury deliberations. (*People v. Moreno* (2011) 192 Cal.App.4th 692, 705; *People v. Elam* (2001) 91 Cal.App.4th 298, 316.) As with acts of misconduct, a language deficiency requiring discharge of a juror must appear in the record as a demonstrable reality. (*People v. Szymanski* (2003) 109 Cal.App.4th 1126, 1131.)

We conclude that the record shows that Juror No. 7's command of English was sufficient for him to fulfill the duties of a juror and that Gant was not prejudiced in any manner. Gant relies solely on Juror No. 7's own declaration indicating that he was Chinese and English was a second language. The declaration states that he "understood 90-95 % of the trial," and used a "translation dictionary . . . to look up the words [he] did not understand."

7

The declaration shows that Juror No. 7 did not understand certain English words but does not specify any of those words or indicate that he had any difficulty in understanding the evidence or jury instructions. Jurors necessarily come from all walks of life and have varied educational backgrounds. The ability to fulfill the duties of a juror is not limited to people who are well educated or whose first language is English. Jurors must have the ability to understand the evidence and communicate during deliberations, but need not possess an extraordinary vocabulary or an understanding of every nuance of the English language. (See *People v. Elam, supra,* 91 Cal.App.4th at pp. 316-317.)

There is nothing in the record to suggest that Juror No. 7 was unable to understand the evidence or jury instructions or to deliberate effectively. No language deficiency was observed by the trial court, counsel or other jurors during jury selection, testimony or deliberations. Gant submitted no evidence including declarations from other jurors that Juror No. 7 exhibited any language problem that surfaced during trial.

4. *Juror No. 7's Use of Dictionary*

Gant contends that Juror No. 7's use of a dictionary to look up the meaning of certain English words during deliberation constituted prejudicial jury misconduct. We agree that the use of a dictionary was improper but conclude that there was no prejudice.

Use of a dictionary by a juror constitutes misconduct because it involves the use of a source outside the evidence to assist the juror as to factual or legal matters. (*People v. Karis* (1988) 46 Cal.3d 612, 642.) Whether such use requires the reversal of a verdict depends on whether the totality of circumstances shows a substantial likelihood of actual bias or other prejudice. (*People v. Danks* (2004) 32 Cal.4th 269, 303; *In re Carpenter* (1995) 9 Cal.4th 634, 653.)

The evidence in this case does not show that occasional use of a dictionary by Juror No. 7 was likely to have influenced the juror's deliberations or the verdict. The record fails to show what or how many words Juror No. 7 looked up in the dictionary, whether the words were unknown to him, or whether he merely sought confirmation of the meaning. The record also shows no conduct by the juror or other circumstances which would support a finding of a substantial likelihood of bias. (*In re Carpenter,*

8

*supra,* 9 Cal.4th at p. 654.)  In particular, there is no showing or indication that the dictionary was used to look up words and concepts used in the jury instructions.

5.  *Juror No. 7's Deliberations*

Gant also claims Juror No. 7 refused to deliberate.  He bases this claim on an assertion in the juror's declaration that he "already had the case figured out" when deliberations began, "and [I] knew how I was going to vote.  I already made my decision."  A juror may be removed if he or she refuses to deliberate on the theory that such a juror is "'unable to perform his duty'" as a juror.  (*People v. Cleveland* (2001) 25 Cal.4th 466, 475.)

We conclude that there is nothing in the record to support the assertion that Juror No. 7 refused to deliberate.  A juror's formation of an opinion about the proper verdict before deliberations begin does not show a refusal to deliberate and is not misconduct, provided the opinion is based on the evidence presented at trial.  (*People v. Leonard* (2007) 40 Cal.4th 1370, 1412.)  "The reality that a juror may hold an opinion at the outset of deliberations is . . . reflective of human nature.  It is certainly not unheard of that a foreperson may actually take a vote as deliberations begin to acquire an early sense of how jurors are leaning.  We cannot reasonably expect a juror to enter deliberations as a *tabula rasa,* only allowed to form ideas as conversations continue.  What we can, and do, require is that each juror maintain an open mind, consider all the evidence, and subject any preliminary opinion to rational and collegial scrutiny before coming to a final determination."  (*People v. Allen* (2011) 53 Cal.4th 60, 75.)

Also, reliance on the opinion of Juror No. 7 himself as expressed in his declaration rather than the juror's conduct as set forth in the record as a whole runs afoul of the rule that a court cannot consider evidence of a juror's subjective reasoning process.  (*People v. Allen, supra,* 53 Cal.4th at p. 75; Evid. Code, § 1150.)  Here, there is no evidence in the form of declarations from other jurors that Juror No. 7 failed to answer questions posed to him by other jurors, separated himself from other jurors in the jury room, or acted as if he was not listening to comments by other jurors.  (See *People v. Thomas* (1994) 26 Cal.App.4th 1328, 1333.)  Juror No. 7 stated that he did not get to

9

know other jurors or speak much during deliberations, but the demeanor or personality of individual jurors should not be considered in determining their ability to perform the duties of a juror. (*People v. Keenan* (1988) 46 Cal.3d 478, 541.)

6. *Consideration of Extrinsic Material by Jurors Nos. 2 and 5*

Gant contends that Jurors Nos. 2 and 5 committed misconduct by looking at an article about the trial judge and conducting experiments. We disagree.

As stated, jurors may not obtain information from outside sources either as to factual matters or for guidance on the law. (*People v. Karis, supra,* 46 Cal.3d at p. 642.) But, here the record is unclear as to whether there was any misconduct and, if there was, it shows no prejudice.

First, Juror No. 2 looked up an article on the Internet which disclosed that prior to becoming a judge, the trial judge in the instant case was the prosecutor in the high profile Billionaire Boys Club case. There is no contention that the article contained any information relevant to the instant case.

Second, the record shows that Jurors Nos. 2 and 5 conducted "little experiments about distances and the ability to see things at certain lengths." The record includes no other information regarding the nature, scope, or conditions of the "little experiments."

It is misconduct for the jury to conduct its own investigation outside the courtroom including experiments which could be treated as evidence not presented at trial. (*People v. Vigil* (2011) 191 Cal.App.4th 1474, 1483; *People v. Castro* (1986) 184 Cal.App.3d 849, 852-853.) But, not every jury experiment constitutes misconduct. "Improper experiments are those that allow the jury to discover *new* evidence by delving into areas not examined during trial. The distinction between proper and improper jury conduct turns on this difference. The jury may weigh and evaluate the evidence it has received. It is entitled to scrutinize that evidence, subjecting it to careful consideration by testing all reasonable inferences. It may reexamine the evidence in a slightly different context as long as that evaluation is within the "'scope and purview of the evidence.'"

10

[Citation.]  What the jury cannot do is conduct a new investigation going beyond the evidence admitted."  (*People v. Collins* (2010) 49 Cal.4th 175, 249.)

Accordingly, a jury has the right to examine and test the evidence presented at trial in a form which might be construed as an "experiment" but which does not go beyond the scope of the evidence.  (*People v. Castro, supra,* 184 Cal.App.3d at pp. 853–854.)  Here, the record contains no indication that the "little experiments" interjected any information outside the record to expand upon the evidence presented at trial.

The judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P. J.


YEGAN, J.

Frederick N. Wapner, Judge

Superior Court County of Los Angeles

_____

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, Mark E. Weber, Deputy Attorney General, for Plaintiff and Respondent.