Filed 1/20/22  P. v. Valadez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>ANDY STEVE VALADEZ,<br><br>      Defendant and Appellant. | B305636<br><br>(Los Angeles County<br>Super. Ct. No. YA093307) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Edmund Willcox Clarke, Jr., Judge. Affirmed.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

A jury convicted Andy Steve Valadez of second degree murder, making a criminal threat, child abuse, and found he personally used a firearm during each offense. On appeal, Valadez argues the trial court erred when it: (1) discharged a juror shortly before deliberations began because it determined he had an insufficient command of the English language; (2) admitted evidence of Valadez's prior domestic violence; (3) precluded Valadez's expert psychiatrist from offering an opinion on whether Valadez was unconscious at the time he committed the offenses; and (4) did not instruct the jury on misdemeanor child abuse as a lesser included offense to felony child abuse. We affirm.

## BACKGROUND

Valadez lived with his wife, Sandra Valadez,[1] and their four children in a back house on property that they shared with Sandra's relatives. In November 2015, Valadez came home and, without warning, shot Sandra several times. Sandra, who was holding their infant child, fell to the floor. Two of the Valadez children—ages six and eight at the time—saw their father shoot their mother. The six-year-old ran out of the house and told her aunt, "Daddy shot mommy." Sandra died from her wounds, but the infant was uninjured.

After hearing gunshots, Sandra's aunt entered the room and fought with Valadez as he threatened to kill everyone else on the property and tried to reload his gun. The police arrived several minutes later and arrested Valadez. Valadez testified at

---

[1] Because Valadez and his wife shared the same last name, we refer to his wife by her first name.

trial and claimed he was unconscious when he shot Sandra due to a mix of alcohol, methamphetamine, and anti-anxiety medication.

The People charged Valadez with one count of murder (Pen. Code,[2] § 187, subd. (a); count 1), one count of making a criminal threat (against the aunt) (§ 422, subd. (a); count 2), and one count of child abuse (§ 273a, subd. (a); count 3). As to count 1, the People alleged Valadez personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), and as to counts 2 and 3, the People alleged Valadez personally used a firearm (§§ 12022.5, subd. (a), 1203.06, subd. (a)(1)).

A jury found Valadez guilty of second degree murder,[3] making a criminal threat, and child abuse, and it found true the firearm enhancements as to each offense. The court sentenced Valadez to 56 years to life in prison.

Valadez appeals.

---

[2] All undesignated statutory references are to the Penal Code.

[3] The court instructed the jury on four theories of homicide —first degree murder, second degree murder, voluntary manslaughter, and involuntary manslaughter—and voluntary intoxication and unconsciousness as defenses to some of the charged forms of homicide.

## DISCUSSION

### I.    Juror discharge[4]

Valadez contends the court erred when, shortly before deliberations began, it discharged a juror—Juror No. 6—after finding he did not have sufficient proficiency in English.

The court had the prospective jurors complete questionnaires before the court and counsel questioned them.[5] During jury selection on January 9, 2020, addressing the juror in question and apparently reading from the questionnaire, the court stated, "Area of residence is Inglewood.  Occupation, waiter.  Significant other is a housewife.  So she definitely is working because he mentions three sons at home, all under the age of 18."

The court continued, "So you didn't say whether you could be fair or not.  Do you feel you could be fair to both sides?"  Juror No. 6 responded, "Oh, I forgot that.  But yeah, I think, if I choose, I can be fair."[6]  The court said, "All right.  You could be fair to

---

[4] Our dissenting colleague accuses us of "minimizing the parts of the record that undercut the [trial] court's reasoning." (Dis. opn. *post*, at p. 2.)  To the contrary, our recitation of the facts that follows includes every discussion and exchange in the record on appeal with or regarding the juror in question.  Notably, the dissent gives not one single example of any part of the record we have "minimize[ed]."

[5] We granted Valadez's motion to augment the record to include the questionnaire completed by the juror in question, but the superior court responded with a certificate of clerk that it could not find the document.

[6] It's unclear whether the juror meant, "if chosen as a juror, I can be fair" or "if I choose to, I can be fair."  These two possible meanings of the juror's response are quite different, and the

both sides.  [¶]  Now, you mentioned something.  Of course, I don't want to embarrass you, but you said something about your English, that maybe you're not as comfortable with your English as you would like to be."  Juror No. 6 replied, "Yeah. It's not that complete English.  Sometimes I have doubts about what I hear."  The court said, "Okay.  So I'm understanding you find—and I assume when you're saying what you hear, you can actually hear it, but you don't always feel you're understanding?  Is that what you're saying?"  Juror No. 6 responded, "Yes that's what I'm saying."

The court's colloquy with Juror No. 6 continued:

"The court:  Do you mind if I ask you, how long have you been in this country?

"Prospective Juror N[o. 6]:  Since 1980.

"The court:  Since 1980.

"Prospective Juror N[o. 6]:  Yes.

"The court:  So that was—Jimmy Carter was the president.  No, Reagan.  Around about the same time.  So that was almost 40 years ago, right?

"Prospective Juror N[o. 6]:  Yes, sir.

"The court:  And you are a waiter?

"Prospective Juror N[o. 6]:  Yes.

"The court:  And you interact with customers in English?

"Prospective Juror N[o. 6]:  Yeah.

difference is important.  We do not share our dissenting colleague's view that "all of Juror No. 6's responses to the court's questions were articulate and precise."  (Dis. opn. *post*, at pp. 2–3.)

"The court: Okay. So the lawyers are supposed to use basic English in the courtroom, not fancy. They know that the jurors want to understand things, so they try to keep it in basic English so that everyone is following.

"Do you think if they keep it basic, that you can follow and understand?

"Prospective Juror N[o. 6]: What I mean is, when they speak too fast, it's when I get a little trouble.

"The court: So you can understand the words if they're said slowly, but when people start speaking quickly, you have a problem following?

"Prospective Juror N[o. 6]: What I mean is, some words I don't really understand. But I understand 75 percent maybe.

"The court: Okay. So if the lawyers speak at a reasonable speed . . . .

"So I think they'll keep it slow, that is, the lawyers and the witnesses. And basic. But they may have more questions for you."

In response to a question the court had asked all the jurors, Juror No. 6 then said his favorite vacation spot was Puerto Vallarta, Mexico and his favorite pets were dogs.

Neither of the attorneys questioned Juror No. 6 about his ability to speak or understand English or challenged him for cause. Juror No. 6 was sworn as a juror on Friday, January 10, 2020.

The next court day was Monday, January 13, 2020. The first witness was the 11-year-old daughter of Sandra and Valadez (who was six when her mother was murdered). After the court excused the jurors for lunch, he advised counsel that Juror No. 6

6

had "sent a note." The court said, "[Y]ou'll remember him because he commented about his English language skills during voir dire." The court told counsel they'd get a copy of the note, adding, "[a]nd at some later time, if you wish, we can address it. It's not my plan to do anything. [¶] He asked if he could talk to me in private for a few minutes. That's not going to happen. But we'll copy it and we'll have it. And we can talk about it soon [*sic*] or later, depending on your request."

The note read:[7] "Your honor so sorry to take part of your beesy time I'm jury # [6] If I can talk to you in private for a few minutes pleace. What I want to talk to you is about what I told you the firt day of selection of jury about my English im very confuse about anderstanding so many words I never use or hear before and I think if I dont know them I can't be fair to this case if you let me explain more of this to you thank you very much."

On Friday, January 17, 2020, the prosecution rested, and the defense began calling witnesses. At the end of the day, after excusing the jurors, the court said, "So, counsel, I have not dealt with the note from the juror in seat 6 which expressed a language issue, and it seems like you're going to have enough alternates to get through the length of the trial." Defense counsel responded, "Yes." The court continued, "If you already know that you would like to excuse him, we could do it now and maybe catch him before he goes, or I could tell him first thing Tuesday[8] and draw

---

[7] Errors in spelling, punctuation, and grammar are as they appear in the note. A copy of Juror No. 6's note is attached as appendix A, *post*, page 1.

[8] Monday, January 20, 2020, was a court holiday.

randomly from the three. If you haven't decided and want to tell me on Tuesday your decision, that's also fine." Defense counsel stated, "I can tell you now that I would rather he stay." The court asked, "So you don't want him excused, even though he has expressed what he expressed?" Defense counsel answered, "Yes, your honor."

The court told the prosecutor, "I won't ask you your opinion since I don't plan to excuse him based on what he wrote. The most I would do, if someone asked me, is to maybe question him, but no one has asked for that. [¶] So we'll leave the note as it stands for now and trust that he does understand and that he was motivated perhaps by a desire to go somewhere else."

On the next court day, Tuesday, January 21, the defense case continued. At the lunch break, the court told counsel, "I'll remind you that Juror No. 6 did write a note about language understanding. No one's asking to question him further, and I don't intend to unless either side or the other wants that issue raised."

Valadez testified on his own behalf. The defense also called a number of family members and law enforcement officials to testify. In addition, the defense called Dr. Jack Rothberg, a medical doctor board-certified in psychiatry and neurology. Dr. Rothberg also has a Ph.D. in psychoanalysis and is board-certified in forensic psychiatry.

Dr. Rothberg told the jury that Valadez had taken Depakote in the past, which was "used for mood stabilizing." Dr. Rothberg explained the "very complex interaction" between methamphetamine and alcohol. He also explained the difference between a blackout and unconsciousness. Dr. Rothberg said Valadez had been taking amitriptyline, which was an

antidepressant with "a lot of side effects" at "a therapeutic level." The court permitted Valadez's counsel to pose a hypothetical to Dr. Rothberg, and explained to the jurors what a hypothetical was. The court and defense counsel then discussed with Dr. Rothberg what a "flattened affect" is.

After the parties rested, on the morning of Friday, January 24, 2020, the court discussed jury instructions with counsel. The prosecutor then said, "Your honor, the court had received a note from Juror N[o.] 6 back on January 13, 2020. I had not previously requested any follow-up with the juror. . . . The reason in part was because it was so early on in the trial that I was not sure if this juror was still trying to potentially get off." The court replied, "Yes, I remember him. Are you saying now that you want to excuse him or you want him questioned or what are you going to ask for?" The prosecutor answered, "Just the latter, your honor. Since the entire evidence has been presented, I just want the court to follow-up and make sure that he has understood; that he does not feel that his proficiency in the English language would inhibit his ability to partake as a juror."

The court said, "All right. Mr. Rodriguez?" Defense counsel responded, "I would object, your honor. He's been here throughout the entire time. And the court has not received any additional notification from him despite or even though the court has not solicited [*sic*]. [¶] So I believe at this point in time, once he's heard all the testimony and the evidence, I think it's a bit too late now to even attempt to remove him from the jury."

The court replied, "Well, I'd say it's never too late. But what I will do is, at some point, perhaps after arguments have been concluded, ask him if he still feels the same way he did when he wrote the note. And if this record is read on appeal,

9

someone else can count how many times I asked you all about this, and it was more than once."

The court began reading the instructions to the jury, then recessed for lunch. When counsel returned, the court asked, "Do either of you have any thoughts about the appropriate time to question Juror No. 6? It seems to me that we could question him after arguments have been concluded and instructions have been concluded. We could question him at a natural break point in between arguments or during arguments." The prosecutor said she had no preference. The court asked defense counsel, "Mr. Rodriguez, you have been consistently saying you don't think he should be questioned. But if he's going to be questioned, do you have any thoughts about when would be the best time?" Counsel responded, "I think he should be questioned after arguments." The court replied, "All right. So after the arguments are concluded . . . I will question him . . . and either he will be seated—or go to deliberate with the other 11 or he will be replaced."

The court instructed the jury on first and second degree murder, voluntary manslaughter, and involuntary manslaughter. The court also instructed the jury on general and specific intent, child abuse, criminal threats, prior domestic violence as evidence, and voluntary intoxication, in addition to all the other standard instructions.

The prosecutor presented her closing argument and defense counsel began his, but did not complete it by the end of the court day. The court excused the jurors for the weekend, asking Juror No. 6 to remain.

The court read the juror's note into the record, stating, "I might change the wording a little bit so that it reads more

smoothly." The court then said, "[S]ometimes your grammar is just not precise. You said 'confuse,' not 'confused' with a d on the end. I'm not saying that to criticize you, but I think it shows that maybe you haven't polished your English as well as you'd like, but I haven't polished mine as much as it needs either."

The court continued, "So now you've heard the evidence. You've heard the testimony of the defendant. You've heard the various witnesses. And I don't know if you feel you understood most of it or not, or you still have the worry that there [are] some words that you didn't understand. What do you think?"

Juror No. 6 responded, "Yes. Especially the first-degree, second-degree, and so many different options there." The court asked, "So the instructions that I read today, you found that a little confusing? Also mentioned in some of the arguments." The juror answered, "Yes." The court asked, "But that part? [¶] And how about the testimony of the witnesses? Now, some of the witnesses were laypeople, but others were experts. Did you feel you understood the expert testimony, like the coroner, the firearms expert, the doctor who was here yesterday who was a psychiatrist? Did you understand those people?" Juror No. 6 replied, "No, not all really."

The court said, "Okay. And not all. I would like your feeling in your heart. Do you feel you missed enough that you're uncomfortable trying to make a just decision?" Juror No. 6 responded, "Honestly, I would say, yeah, I think that I would follow somebody else's opinion to just think about what is right, what is wrong." The court asked, "So to trust yourself and make your decision on your own is going to be hard? That's what you're telling me? And you might choose another juror just to agree with that person or go along with them? Is that what you're

11

saying?" Juror No. 6 replied, "That's what I think could happen."**9**

The court asked Juror No. 6 to "step into the jury room for just a moment." The court then told counsel, "[T]here are some words misspelled" and "[t]he grammar is not perfect," but "primary English speakers" make those mistakes too. "[O]f greater concern," however, was "[t]he comment that the juror made that he might simply go along with someone else because he's not confident in his own perception of the evidence or the instructions." The court said, "It does concern me if he hasn't meaningfully received all of the testimony."

The court asked the parties if they wanted to excuse Juror No. 6. The prosecutor said she wanted the juror excused; defense counsel stated, "I don't want to excuse him." Defense counsel continued, "I don't want to be blunt, but that happens with everybody, I think, when they see the instructions, that they claim that the law is so complicated that they may have to go along with somebody else. [¶] Well, I believe that he speaks enough—well enough to know what this case is about. This case

---

**9** At that juncture, as closing arguments were still underway, the court had not yet read the concluding instructions—including CALCRIM No. 3550—to the jurors. Defense counsel never asked the court to read Juror No. 6 that instruction before proceeding, nor did he request that the judge "admonish" the juror "that the law required him to reach his own conclusions about the case"—an omission our dissenting colleague deems significant. While it may have been helpful for the court to read CALCRIM No. 3550 to Juror No. 6 as part of the colloquy, the court's failure to do so does not warrant reversal of Valadez's conviction in our view.

12

is not about patent law or copyright law. This is clear and simple. Somebody got shot, and they're going to have to make a determination whether this man was unconscious or not. And I don't think that the language used by Dr. Rothberg was at all complicated. That's the only expert testimony that would impact on somebody's decision."

The court replied, "Well, I agree that the analysis of consciousness or blackout is very important in this case. And understanding what Dr. Rothberg had to say would be important to that." Defense counsel said, "[T]he words that Dr. Rothberg used, I don't think he ever used anything that was complex." The court responded, "Well, he did talk about the effects of various intoxicating substances and how they interact with one another. And it may be that he kept it simple enough that this man would understand it. And I would agree with you that I would expect a jury, upon hearing the instructions that I read today, to say I got it crystal clear, what is a first, what is a second, what is voluntarily [*sic*], what is an involuntarily [*sic*], what charges intoxication applies to, what is wilfullness in the context of blackout, et cetera."[10]

The court continued, "I would not expect that. But we are now at the point where he has invested numerous days in this trial. And so any motive to discount his English understanding as a means of escaping lengthy jury duty has—it's not removed, but it's substantially diminished. [¶] And now we are asking a

---

[10] It appears the court meant to say it would *not* expect a jury to find those instructions "crystal clear." It's also likely the court used—or meant to use—the terms "voluntary" and "involuntary," referring to manslaughter.

13

man who is under oath and who I believe is someone of good conscience to tell us what he thinks. And the notion that he would sit in the jury room and pick somebody to follow and essentially give that person two votes rather than one is of great concern to me. [¶] And if it wasn't my suggestion that started that, it was the way he characterized it, that he might rely on someone else. And I'm someone who has, I think, decent English skills. My Spanish is pathetic, and I know that I would rely on a good Spanish speaker in many situations to help me. [¶] And so my concern is that this man, who is supposed to vote one vote that shows his verdict in the case has already indicated, for reasons that I think are understandable or forgivable, that he's likely to be voting along with and arguing [*sic*] along with some other person who he thinks understands the evidence rather than someone who persuasively argues the evidence that someone actually understands it."

The court concluded, "I'm going to find good cause to excuse him." The court summoned Juror No. 6 back to the courtroom and discharged him from the jury, thanking him for his service and telling him, "I don't want you to be uncomfortable having to decide something this important if you are not confident in your own perception of the evidence." On the next court day, the court replaced Juror No. 6 with an alternate.

A.    *Applicable law and standard of review*

Under section 1089, the court may discharge a juror and replace him with an alternate "[if] at any time, whether before or after the final submission of the case to the jury, [the] juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor." A good

14

cause removal has been found most commonly in situations where a juror becomes physically or emotionally unable to continue to serve due to illness, or other circumstances. (*People v. Cleveland* (2001) 25 Cal.4th 466, 474.)

" 'Insufficient command of the English language to allow full understanding of the words employed in instructions and full participation in deliberations clearly . . . render[s] a juror "unable to perform his duty" within the meaning of . . . section 1089.' " (*People v. Lomax* (2010) 49 Cal.4th 530, 566; see Code Civ. Proc., § 203, subd. (a)(6) [to serve as juror, a person must be "possessed of sufficient knowledge of the English language"].) However, mere "inarticulateness" in explaining one's position or some "language difficulties" does not constitute grounds for discharge. (*People v. Elam* (2001) 91 Cal.App.4th 298, 317–318 (*Elam*).)

"The trial court's decision whether or not to discharge a juror under section 1089 is reviewed for abuse of discretion and will be upheld if supported by substantial evidence; to warrant discharge, the juror's bias or other disability must appear in the record as a demonstrable reality." (*People v. Holloway* (2004) 33 Cal.4th 96, 124–125; *People v. Lopez* (2018) 5 Cal.5th 339, 365.) The demonstrable reality test "requires a 'stronger evidentiary showing than mere substantial evidence.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 821.) This "more stringent" standard "entails a more comprehensive and less deferential review" than a "substantial evidence" review. (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052–1053.)

The heightened abuse of discretion standard applicable to the discharge of a juror " 'more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.' " (*People v.*

*Armstrong* (2016) 1 Cal.5th 432, 450.) A reviewing court "must be confident that the trial court's conclusion is manifestly supported by evidence on which the court . . . relied." (*People v. Barnwell*, *supra*, 41 Cal.4th at p. 1053.) The "demonstrable reality" standard "requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias [or other disability] was established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either [the substantial evidence or the demonstrable reality] test." (*Id.* at pp. 1052–1053.)[11]

*People v. Compton* (1971) 6 Cal.3d 55, 60 is the genesis of the "demonstrable reality" test. In that case the trial court removed an alternate juror before deliberations when it learned the juror had a conversation about the case with a barber over a weekend recess. The barber testified the juror had stated that certain older women had been rejected as jurors " 'because they would be hard to keep an open mind on a case such as this and what the people that selected the jury didn't know, that he felt the same way' " and that " 'he didn't like to be on a case like this because it was hard to keep an open mind.' " (*Id.* at p. 59.) The trial judge discharged the alternate " 'out of an abundance of

---

[11] Our dissenting colleague states the trial court erred in crediting "Juror No. 6's statement that due to his misgivings about his ability to comprehend English, he might adopt another juror's conclusion about 'what is right, what is wrong.' " (Dis. opn. *post*, at p. 4.) In our view, this is the sort of reweighing of the evidence that Justice Corrigan "ma[d]e clear" reviewing courts are not to do. (*People v. Barnwell*, *supra*, 41 Cal.4th at pp. 1052–1053.)

16

caution and in fairness to the defendant.' " (*Id*. at p. 60.)  The court never queried the alternate about the equivocal remarks nor were other jurors questioned; the trial court speculated that the juror may have inadvertently communicated his view to the other jurors.  Our Supreme Court characterized the trial court's reasons as "bare speculation" (*id*. at p. 61) not satisfying the " 'good cause' " standard of section 1089 (*id*. at p. 60).  Significantly, the court stated that a trial court has "at most a limited discretion to determine that [the juror is unable to perform] and that inability must appear in the record as a demonstrable reality."  (*Id*. at p. 60.)

B.     *Analysis*

In this case, Juror No. 6 repeatedly expressed his concerns about understanding words in English.  In the jury questionnaire he stated he was "not as comfortable with . . . English as [he] would like to be."  During voir dire he explained he sometimes has "doubts" about what he hears in English.  He then said he doesn't always feel confident that he can understand everything he hears in English.  He admitted that when "they speak too fast, it's when [he] get[s] [in] trouble."  The trial court followed up once again to ascertain Juror No. 6's meaning, and the juror stated, "What I mean is, some words I don't really understand.  But I understand 75 percent maybe."

Neither attorney questioned Juror No. 6 about his statements in voir dire or exercised a challenge for cause, and the juror was sworn.  Neither attorney suggested or intimated that Juror No. 6 was being disingenuous or misrepresenting his

17

English comprehension to avoid jury service, and he did not otherwise state he was unwilling to serve.[12]

At the beginning of trial, after the testimony of just one witness, Juror No. 6 submitted a note—which contained numerous grammatical and spelling errors—asking to speak to the court about his English comprehension. At this early point in the trial, Juror No. 6 had stated twice in writing and three times in questioning that he was having trouble with comprehension.

We agree grammatical errors, by themselves, are not good cause to discharge this juror or any juror. But the note the juror submitted following the testimony of the first witness can be fairly characterized only as a plaintive and anxious communication from the juror himself that he was struggling to understand everything. It is neither ambiguous nor an obvious misrepresentation. Again, the juror had expressed repeatedly that he was distressed about his ability to comprehend what was being said. The trial court specifically found Juror No. 6 to be sincere and acting in "good conscience." No judge fulfilling an obligation to ensure a fair trial to both sides could ignore this.

Moreover, due respect for citizens who respond to a summons for jury service and take an oath to tell the truth is

---

[12] We find little significance to the fact the defense attorney opposed removing Juror No. 6 based on any perceived language difficulties. We find it impossible to believe the defense attorney did not appreciate that Juror No. 6 was expressing concern about comprehension. Rather, we think it likely there were other possible motivations for the defense strategy, about which speculation is unwarranted. Moreover, it is of no moment, as the trial court's paramount responsibility is to provide both sides with a fair trial, which means 12 competent jurors.

warranted. Someone who states unequivocally that he or she has a question about comprehension is entitled to have that opinion given some credence. After all, who would know better: the juror, the trial judge, or a reviewing court? And if a judge or reviewing court is to second guess a juror, or is required to undertake an even more thorough interrogation, what does that mean for someone who says their child has taken ill and needs assistance; a parent whose childcare is unexpectedly unavailable; a student who learns their continued absence from class will impact their grades; or a person who says he or she underestimated the severe financial impact jury service would cause. (The hypothetical examples are endless.)

The trial court here held onto the note for more than a week and raised the matter repeatedly with counsel. Eventually, the prosecutor asked the court to follow up with Juror No. 6. But defense counsel objected to even questioning the juror, and to removal, arguing it was too late as the juror had heard all the testimony and evidence. The court correctly responded that it's never too late and again questioned Juror No. 6 outside the presence of the other jurors. Specifically, the court asked Juror No. 6 if he had understood the expert testimony "like the coroner, the firearms expert, the doctor who was here yesterday who was a psychiatrist?" and Juror No. 6's response was "[n]o, not all really." Dr. Rothberg's expert testimony was the linchpin of the defense case. Valadez had no other defense, as his family witnessed his execution-style shooting of his wife.

The court then asked if Juror No. 6 felt he "missed enough that [made him] uncomfortable trying to make a just decision" and Juror No. 6 responded, "Honestly, I would say, yeah, I think that I would follow somebody else's opinion to just think about

19

what is right, what is wrong." And, in response to a final question from the court, Juror No. 6 admitted he would defer to another juror "just to agree with that person or go along with them."

*People v. Szymanski* (2003) 109 Cal.App.4th 1126 (*Szymanski*) is instructive on the issue of a trial court's discretion to remove a juror because of language difficulties. In that case, the juror in voir dire informed the court that she had been in the United States for nine years; she primarily spoke Chinese; and she had difficulty understanding and speaking English. (*Id.* at p. 1129.) Although she worked in the United States, she mostly spoke Chinese at her job. (*Id.* at pp. 1131–1132.) The juror's responses to the court's questions were "unintelligible" and spoken in broken English. (*Id.* at p. 1131.) The juror also admitted she did not understand several common English terms and phrases, such as " 'law enforcement' " and " 'police department.' " (*Id.* at p. 1132.) The court denied the challenges for cause from both attorneys, finding the juror appeared to understand the proceedings "pretty well" and noting that, if the juror had difficulty understanding them, she could always ask for explanations. (*Id.* at p. 1130.) The juror was sworn and served on the jury. (*Id.* at p. 1128.)

The Court of Appeal reversed the judgment, concluding the trial court erred in denying the challenges for cause. (*Szymanski*, *supra*, 109 Cal.App.4th at pp. 1128–1133.) The court reasoned that it was "hard to imagine what else [the juror] could have said or done to convey that her insufficient understanding of the English language was a reality." (*Id.* at p. 1132.) Most significantly, the *Szymanski* court recognized that a failure to remove a juror who (in some manner) has manifested difficulty

20

in understanding the testimony would violate a defendant's constitutional due process and fair trial rights.

In contrast is *Elam*, *supra*, 91 Cal.App.4th 298. There, the Court of Appeal concluded the trial court committed prejudicial error by removing a juror after half a day of deliberations. (*Id.* at p. 313.) The juror had " 'some' difficulty with . . . English"—" 'a little bit' "—and spoke with a "pronounced accent." (*Id.* at p. 313; see *id.* at p. 321, appen.) But the juror recently had received an associate of arts degree in English at a local college and had served in the United States Navy where he spoke English "continuously." (*Id.* at p. 313; see *id.* at pp. 321–322, appen.) While the juror's parents spoke Spanish, and English was not his first language, he'd been born in the United States and grew up speaking English. (*Id.* at p. 313; see *id.* at p. 322, appen.) The juror had lived in the Philippines, Guam, and Italy. (*Id.* at p. 322, appen.) He told the court he had "no problem understanding the testimony" and he understood the instructions as well; he said he felt "able to participate in [the] discussions." (*Id.* at pp. 313–314; see *id.* at pp. 321–323, appen.)

The appellate court concluded the record did not establish as a demonstrable reality that language difficulties—"as opposed to his failure to deliberate well, his reliance upon faulty logic or analysis, and his disagreements over the law and the evidence"— accounted for the difficulty in deliberations the other jurors reported. (*Elam*, *supra*, 91 Cal.App.4th at p. 318.)[13]

---

[13] Most of the published cases, like *Elam*, involve the removal of a juror during deliberations. Those cases are especially fraught, and treacherous for trial judges, because of the necessity of protecting the sanctity of jury deliberations. (See

21

As in *Szymanski*, here, it is unclear what more Juror No. 6 could have said to communicate his concern about comprehension. While the juror may have been underestimating his English proficiency or simply lacked confidence or was dissembling, a trial court is neither mind reader nor grammatical linguist. Neither is it omniscient: no judge could possibly know the degree to which Juror No. 6 was capable of English comprehension, but the record is clear Juror No. 6 had serious concerns about it.

It is suggested that the trial court's inquiry should have been more thorough, but such an inquiry is itself fraught with danger. A trial court should generally avoid questioning a juror during the trial about what aspects of the testimony he or she did not understand. First, it would be almost impossible for a juror (or any person) to recall every word that may have caused confusion. This also makes the invitation to have the "readback" of testimony that was not understood in the first place an illusory fix. Additionally, it invites the court or counsel to explain the meaning of a word or phrase (clear error) or opens the trial up to a recall of witness by the attorneys. (See *People v. Szymanski*, *supra*, 109 Cal.App.4th at p. 1130.) It also invites the court to question the juror after each witness has testified to determine what parts (if any) the juror did not understand. Whether this is to be done in front of the other jurors is also problematic, because it invites those other jurors to similarly express their views about testimony they may have found confusing. Arguably this kind of process would undermine a defendant's fair trial and due process

*People v. Cleveland*, *supra*, 25 Cal.4th at p. 475 [" 'The secrecy of jury deliberations should be closely guarded' "].)

rights because it allows a prosecutor to query the jury as the trial proceeds about possible gaps in the prosecution's case. Along the same lines, confusion attributable by a juror to language comprehension might in reality be simply a witness who was unusually confusing in any language. When a juror on multiple occasions has asserted (unequivocally) difficulty in understanding and comprehending English, there are due process barriers in conducting a more exhaustive interrogation, either during trial or deliberations.

As noted in *Szymanski*, *supra*, 109 Cal.App.4th at page 1132, it is axiomatic that jurors must fully understand spoken and written English. "[A]ppellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record." (*People v. Stewart* (2004) 33 Cal.4th 425, 451; *People v. Avila* (2006) 38 Cal.4th 491, 529; cf. *People v. Holloway*, *supra*, 33 Cal.4th at p. 125 [no abuse of discretion in not discharging juror; noting trial court's "opportunity to observe the juror's demeanor"].)

The trial court's questioning of Juror No. 6 reflects it understood its fundamental obligation to protect the due process and fair trial rights of Valadez as well as the People. It was critical to Valadez's defense that jurors be able to understand Dr. Rothberg's expert testimony, as well as the court's instructions on the different types of homicide, direct and circumstantial evidence, general and specific intent, and unconsciousness. The court's statement of reasons for excusing Juror No. 6 shows it acted as the trier of fact, and, in light of

the entire record, its removal of the juror was not an abuse of discretion. The record demonstrates good cause to discharge Juror No. 6 as a demonstrable reality.

## II. Expert opinion

### A. *Relevant background*

As we have said, Valadez called Dr. Rothberg to offer an opinion as to his mental state at the time of the offenses. The defense theory was Valadez was unconscious at the time. To lay the foundation for the expert's opinion, Valadez elicited testimony that the doctor had obtained information from a variety of sources about Valadez's family history and dynamics; his prior psychiatric and mental health issues; and his drug and alcohol history. Dr. Rothberg interviewed Valadez at the jail and obtained an understanding of his recollection of the circumstances surrounding the incident. He also reviewed medical records, police reports, and court documents, including the preliminary hearing transcript and Valadez's criminal history.

Dr. Rothberg elaborated for the jury on all of these topics and their significance to his testimony. He testified he was aware Valadez suffered from a history of depression and had been prescribed an antidepressant (Depakote) as a mood stabilizer; had a prior "psychiatric commitment"; had a history of alcohol and drug abuse; had consumed methamphetamine, amitriptyline, and a fifth of vodka on the date of the offense; that a person consuming such substances could experience a "blackout" or unconscious state; that Valadez had a history of having blackouts; he had been described on the date of the shooting with having a "flat affect," "a blank stare," a "drugged look," "eyes rolling back," and appeared "dizzy" and

24

"emotionless"; and could not remember the incident the next morning when questioned.

Defense counsel asked Dr. Rothberg, without objection, "Assume that Mr. Valadez had consumed about $10 worth of methamphetamine that night or . . . afternoon [and] consumed about a fifth of . . . vodka, would it be reasonably possible for him to have fallen into a state of unconsciousness as you described?" Dr. Rothberg responded, "It could." Dr. Rothberg opined that a person in a state of unconsciousness caused by alcohol and drugs could shoot a gun, reach for a magazine of bullets, and not be able to remember any of these acts.

Defense counsel asked the court for permission to ask the expert whether Valadez "was unconscious at [the time of the shooting]." The court advised counsel, "[Y]ou can lay out the factors and say, would a person fitting those factors be unconscious? But you should not ask him whether it's his opinion that [Valadez] was unconscious; his opinion whether [Valadez] was depressed; [or] his opinion about the facts of the killing. He can give the jury the tools from which they can reach the conclusion."

The trial court stated the proposed question called for an impermissible expert opinion because "it's an ultimate question and invades the province of the jury to have a doctor telling them that someone was unconscious."

Defense counsel then asked the doctor, "So we assume these factors: assume a hypothetical person who has consumed a substantial amount of alcohol, consumes $10 worth of methamphetamine, is dizzy while walking into his residence, is noticed to have . . . a flat affect, blank stare, emotionless, rolled eyes, looked drugged, doesn't look right. The person participates

25

in a very violent event where his wife is killed in the presence of his children with a gun.  And then that person claims not to have remembered the incident the following morning when he's interviewed by the detectives.  [¶]  Do you have an opinion as to whether or not that person could be unconscious?"

The doctor answered that "[h]e could be" based upon "his presentation, the consumption of alcohol, the lack of any recollection for the incident, [and] the lack of emotion.  All of those factors certainly suggest that as a possibility."  When pressed further by the defense attorney, the expert stated, "It's a reasonable possibility."

B.    *Applicable law*

Section 28 prohibits "[e]vidence of mental disease, mental defect, or mental disorder . . . to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act."  Such evidence "is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated or harbored malice aforethought, when a specific intent crime is charged."  (§ 28.)

Section 29 prohibits any expert testifying about a defendant's mental illness, mental disorder, or mental defect from discussing "whether the defendant had or did not have the required mental states . . . for the crimes charged."

In *People v. Herrera* (2016) 247 Cal.App.4th 467, 476, the Court of Appeal stated sections 28 and 29 "do not prevent the defendant from presenting expert testimony about any psychiatric or psychological diagnosis or mental condition he may have, or how that diagnosis or condition affected him at the time

of the offense, as long as the expert does not cross the line and state an opinion that the defendant did or did not have the intent, or malice aforethought, or any other legal mental state required for conviction of the specific intent crime with which he is charged."

"Expert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form such intent is not admissible at . . . trial. [Citation.] Sections 28 and 29 permit introduction of evidence of mental illness when relevant to whether a defendant actually formed a mental state that is an element of a charged offense, but do not permit an expert to offer an opinion on whether a defendant had the mental capacity to form a specific mental state or whether the defendant actually harbored such a mental state. An expert's opinion that a form of mental illness can lead to impulsive behavior is relevant to the existence *vel non* [(or not)] of the mental states of premeditation and deliberation regardless of whether the expert believed appellant actually harbored those mental states at the time of the killing." (*People v. Coddington* (2000) 23 Cal.4th 529, 582–583, fns. omitted.)

A criminal defendant's federal constitutional right to present a defense is not violated by the "exclusion of expert testimony on the ultimate question of fact as to whether appellant did form those mental states." (*People v. Coddington*, *supra*, 23 Cal.4th at p. 583.) The *Coddington* court stated, "Sections 28 and 29 do not preclude offering as a defense the absence of a mental state that is an element of a charged offense or presenting evidence in support of that defense. They preclude only expert opinion that the element was not present." (*Ibid.*)

C.    *Analysis*

Here, defense counsel sought an opinion from the expert that Valadez was actually unconscious at the time of the shooting, and therefore unable to form the mental state for murder.  The trial court correctly ruled this kind of testimony was inadmissible.  Contrary to Valadez's argument, the trial court did not preclude him "from eliciting [Dr. Rothberg's] opinion about [his] mental condition at the time of the . . . shooting." Indeed, Dr. Rothberg testified extensively that Valadez suffered from depression and psychiatric issues; had been prescribed medications; had a history of alcohol and drug abuse; had consumed methamphetamine, amitriptyline, and alcohol on the date of the offense; and that a person consuming such substances could experience a "blackout" or unconscious state.

Finally, Dr. Rothberg was permitted to answer a series of hypothetical questions containing these facts in offering an opinion that such a person, who committed the acts of violence alleged in this case *could be* unconscious.  Dr. Rothberg then clarified that, given the facts presented, unconsciousness is a *reasonable possibility* and that he "can't say anything more than that in terms of certainty."

*People v. Cortes* (2011) 192 Cal.App.4th 873, cited by Valadez, is factually distinguishable.  There, the trial court did not allow the expert to testify about a defendant's diagnoses of mental health and psychiatric problems, and how they related to the defendant's possible mental condition on the date in question.

Valadez's reliance on *People v. Herrera, supra,* 247 Cal.App.4th 467 is also misplaced.  In *Herrera*, at pages 474 to 475, the trial court refused to permit the expert to testify about "anything related to mental state at the time of . . . the offense."

28

Here, the trial court allowed the defense to ask a multitude of questions regarding Valadez's physical appearance and mental state, including the possible effect of alcohol and drug use on someone with Valadez's existing psychiatric issues. The jury was invited to conclude that, in light of all the circumstances, Valadez was in a blackout or unconscious state. No fact or circumstance relevant to this question was withheld from the doctor in offering his opinion or withheld from the jury. The only question Dr. Rothberg was not permitted to answer was whether Valadez was actually unconscious—a question that is properly left to the jury to decide.

Moreover, even Dr. Rothberg seemed to understand the limitation on anyone's capacity to know at some precise time whether another person is in a blackout or unconscious state. As noted, defense counsel pressed the doctor on whether there were "different degrees of possibility" on the question of unconsciousness, to which the doctor replied, "No it's a reasonable possibility. I can't say anything more than that in terms of certainty." There was no error.

## III. Prior bad acts

### A. *Relevant background*

Prior to jury selection the trial court discussed with the attorneys the admissibility of two prior acts of domestic violence perpetrated by Valadez against the victim Sandra. Valadez did not object to the admission of an approximately year-old choking incident witnessed by the couple's then five-year-old daughter. The court also stated it was inclined to admit an incident from 2003 in which Valadez gave Sandra a black eye. At trial several

29

witnesses testified to a consistent level of marital discord, primarily marked by argument and separations.

Following the daughter's testimony at trial regarding the choking incident, the court heard additional argument from both sides on the admissibility of the 2003 incident. The court then stated it would allow the challenged evidence: "I know we talked about this some. . . . [Evidence Code section] 1109 would certainly cover it, assuming that I don't find that it's so old that, in the interest of justice and [Evidence Code section] 352, I should exclude it." "But it's my view that the tensions and continuing unresolved problems in the relationship or recurring problems in the relationship all go to a potential motive for the killing. So if someone beats his spouse because he's frustrated with her and later kills the same spouse, it's a reasonable argument that the frustration and unresolved issues in the relationship led to the killing. [¶] And obviously, the gap of time between one event and the other makes the argument harder for the People to lean on, but it doesn't mean that the argument isn't there."

B. *Applicable law and standard of review*

Evidence Code section 1109, subdivision (a)(1) provides that, where a defendant "is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." However, "[e]vidence of acts occurring more than 10 years before the charged offense is inadmissible . . . unless the court determines that the admission of this evidence is in the interest of justice." (Evid. Code, § 1109, subd. (e).) Valadez claims the

30

introduction of the 12-year-old incident deprived him of due process and, in any event, was an abuse of discretion.

The explicit reference to Evidence Code section 352 directs a court to admit a prior act only if its probative value is " 'substantially outweighed' " by its prejudicial impact.  We review a challenge to the admission of such evidence under the abuse of discretion standard.  (*People v. Branch* (2001) 91 Cal.App.4th 274, 281–282; *People v. Johnson* (2010) 185 Cal.App.4th 520, 531.)

The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense.  Evidence Code section 1109 was intended to make admissible a prior incident similar in character to the charged domestic violence crime, and which was committed against the victim of the charged crime or another similarly situated person.

C.    *Analysis*

In this case the probative value was obvious.  The prior acts of domestic violence occurred in 2003 but there had been another act of violence in 2014.  Both incidents involved the same victim, and both took place in front of one or more family members.  There had been ongoing and consistent discord between Valadez and Sandra, and identity was not an issue.

The evidence that Valadez killed Sandra was overwhelming.  There were numerous witnesses who observed the commission of the crime.  At trial Valadez argued he suffered from psychological and substance abuse issues—that he was in an unconscious state and therefore could not form the requisite intent to kill.  In this circumstance, prior acts of violence against the same victim and a pattern of marital discord are extremely probative on the issue of Valadez's mental state in shooting his

31

wife.  The propensity evidence tends to undermine the notion that Valadez's thought processes were aberrational and attributable to transitory circumstances of drugs and mental incapacity.  Instead, the evidence suggests the more prosaic psychological states commonly associated with anger management in volatile domestic relations.

We also conclude the interests of justice supported the admission of the 12-year-old prior incident.  The jury could better evaluate Valadez's claim of mental incapacity in the context of a long and discordant relationship with the victim.  Moreover, the prior act was less inflammatory than the charged offense, and it was easily and expeditiously proved, eliminating any possible confusion and undue consumption of time.  (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 405; *People v. Poplar* (1999) 70 Cal.App.4th 1129, 1139.)

Additionally, the defense presented an expert witness, Dr. Rothberg, who opined that Valadez may not have been able to form the mental state necessary for first or second degree murder, due to intoxicating substances.  Defense counsel asked the doctor at the outset of direct examination, "Did you review the fact that there was a history of domestic violence between the two of them?"  It was necessary for the defense to elicit this testimony because Valadez's reliance on mental incapacity would have been properly impeached on cross-examination by the history of domestic violence.  Thus, Valadez could exclude the prior acts only by abandoning the mental state defense (which was the only plausible theory, given the overwhelming evidence of the perpetrator's identity).  We find no error in the admission of the 2003 incident.

Finally, even assuming error, we find it harmless under even the most rigorous standard of prejudice. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

## IV. Lesser included instruction on felony child abuse

As noted, the jury found Valadez guilty of felony child abuse (§ 273a, subd. (a)). He argues the trial court erred and violated his constitutional right to due process and a fair trial by failing to instruct the jury, sua sponte, on the lesser included offense of misdemeanor child abuse (§ 273a, subd. (b)).

The People contend there was no sua sponte duty to instruct the jury on the lesser, and, even assuming error, Valadez cannot establish prejudice under *People v. Watson* (1956) 46 Cal.2d 818. On the facts of this case, we find no error.

Section 273a, subdivision (a), defining felony child abuse, provides in part: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment."

Section 273a, subdivision (b), defining misdemeanor child abuse, provides in relevant part: "Any person who, under circumstances or conditions other than those likely to produce great bodily harm or death, willfully causes or permits any child to suffer, . . . or willfully causes or permits that child to be placed in a situation where his or her person or health may be endangered, is guilty of a misdemeanor."

33

The primary difference between felony and misdemeanor child abuse is that the felony offense requires that the proscribed conduct occur under conditions likely to produce great bodily injury. (*People v. Valdez* (2002) 27 Cal.4th 778, 783–784, fn. 4.) Misdemeanor child abuse is a necessarily lesser included offense of felony child abuse. (*People v. Moussabeck* (2007) 157 Cal.App.4th 975, 980; *People v. Lofink* (1988) 206 Cal.App.3d 161, 168–169.)

"A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser. [Citation.] Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, but not the greater, offense. [Citation.] 'The rule's purpose is . . . to assure, in the interest of justice, the most accurate possible verdict encompassed by the charge and supported by the evidence.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 161.) A trial court must instruct on a lesser included offense only when there is substantial evidence: (1) that an element of the charged offense is missing and (2) the accused is guilty only of the lesser offense.

In this case, the evidence showed that Valadez shot Sandra twice in the head while she was holding 11-month-old N.V. in her arms. Valadez argues there was "no evidence compell[ing] the conclusion that the shooting was likely to produce great bodily harm or death to N.V. rather than be merely potentially dangerous." We disagree.

Valadez is conflating the nature of the force used with the risk of harm. There is no doubt that a gun fired at a person involves a level of force that creates a risk of great bodily harm

34

or death.  An evaluation of whether the risk to a child held by that person creates *circumstances or conditions* likely to produce great bodily injury necessarily requires an assessment of the facts surrounding the shooting.  In this case, the evidence showed that a highly intoxicated Valadez fired two shots into the head of Sandra, causing her death.  The evidence further showed that Sandra was holding 11-month-old N.V. in her arms.  The extremely close proximity of N.V. to Sandra clearly involves circumstances and conditions likely to produce great bodily harm.  The risk of great bodily harm could result from a misdirected bullet or if N.V. was dropped or fallen upon.  In sum, given the nature of the force used and the uncontroverted facts of the shooting, there is no substantial evidence that Valadez was guilty of the lesser offense of misdemeanor child abuse.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


HILL, J.[*]


I concur:


EGERTON, J.

---

[*] Judge of the Superior Court of Santa Barbara County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

LAVIN, J., Dissenting:

"Removing a juror is, of course, a serious matter, implicating the constitutional protections defendant invokes. While a trial court has broad discretion to remove a juror for cause, it should exercise that discretion with great care. [¶] … [¶] To dispel any lingering uncertainty, [the California Supreme Court] explicitly [held] that the more stringent demonstrable reality standard is to be applied in review of juror removal cases. That heightened standard more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.) "The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established." (*Id.* at pp. 1052–1053.)

As a preliminary matter, I agree with the majority that jurors must be able to understand the evidence and communicate during deliberations. (See Code Civ. Proc., § 203, subd. (a)(6).) But jurors necessarily come from all walks of life and have varied backgrounds. They need not possess an extraordinary vocabulary or an understanding of every nuance of the English language. (See *People v. Elam* (2001) 91 Cal.App.4th 298, 316–317 (*Elam*).) And as with acts of misconduct, a language deficiency requiring discharge of a juror must appear in the record as a demonstrable reality. (*People v. Szymanski* (2003) 109 Cal.App.4th 1126, 1131 (*Szymanski*).) I also note that "[r]estricting jury service to only special groups or excluding identifiable segments playing major roles in the community"—e.g., non-native English speakers—

"cannot be squared with the constitutional concept of jury trial."
(*Taylor v. Louisiana* (1975) 419 U.S. 522, 530.) "[T]he
representative cross-section rule also serves other essential
functions in our society, such as legitimating the judgments of
the courts, promoting citizen participation in government, and
preventing further stigmatizing of minority groups." (*People v.
Wheeler* (1978) 22 Cal.3d 258, 267, fn. 6.)

  In reviewing the lower court's removal of Juror No. 6, the
majority purports to apply the demonstrable reality standard. In
its analysis of this issue, however, the majority applies a
standard closer to the substantial evidence test, citing evidence
that could support the court's decision, minimizing the parts of
the record that undercut the court's reasoning, and liberally
drawing on inferences to explain the court's failure to solve the
core issue at the heart of this appeal: Whether Juror No. 6's
purported lack of competency to understand English was in fact a
reality. That issue was never resolved by proof sufficient to give
us confidence that Juror No. 6 was properly discharged. (See
*People v. Compton* (1971) 6 Cal.3d 55, 60 (*Compton*) [the facts
must show "an inability to perform the functions of a juror"];
*People v. Armstrong* (2016) 1 Cal.5th 432, 451 (*Armstrong*)
[concerns about sitting juror's lack of competency must be
"manifestly supported by evidence" in the record before the court
may remove the juror].)

  In fact, the record indicates Juror No. 6 *was* proficient in
English despite his lack of confidence in his ability to
comprehend the language. For instance, Juror No. 6 had lived in
the United States for a substantial amount of time—40 years—
and he regularly communicated in English at his job. In addition,
all of Juror No. 6's responses to the court's questions were

articulate and precise, and some of them were complex, spanning several lines and containing proper transitional phrases. Importantly, nothing in the record suggests Juror No. 6 didn't understand any of the court's questions, including those in the written questionnaire Juror No. 6 filled out during voir dire.

Further, although Juror No. 6 claimed he didn't understand some of the testimony he heard at trial, he never identified any specific phrases or terms that he couldn't understand, and the court never asked him to identify which parts of the testimony he didn't comprehend. (See *Szymanski*, *supra*, 109 Cal.App.4th at p. 1130 [fact that juror identified common English phrases that she did not understand supported the court's decision to discharge the juror].) And while Juror No. 6's note to the court contained errors in spelling, grammar, and punctuation, it nevertheless communicated the juror's concerns in a clear and logical manner. Notably, unlike the majority, the lower court gave little weight to the note, remarking that primary English speakers often make the same mistakes when they write. Finally, unlike in *Szymanski*, where both parties challenged the juror for cause, defendant opposed removing Juror No. 6 based on any perceived language difficulties. (*Id.* at p. 1132 [fact that both parties challenged juror for cause supports conclusion that the juror lacked sufficient competency in the English language to serve on jury].)

That Juror No. 6 expressed confusion about understanding the distinction between first and second degree murder after hearing the court's oral instructions does not establish that he lacked a sufficient command of the English language to serve as a juror. At the time the court removed Juror No. 6, it had only read the instructions aloud to the jury. As defense counsel and the

3

court pointed out, it is common for laypersons to find jury instructions confusing the first time they encounter them, especially if they've only heard the instructions read aloud. Indeed, before it began instructing the jury after the parties rested, the court advised the jurors that they didn't "need to try to memorize these instructions now or the elements of anything" and that they should "relax" and "[l]isten to the sense or general feeling you get from the instructions and trust the fact that [the written instructions] will be available to you." But the court removed Juror No. 6 before deliberations began, depriving him of the opportunity to review the instructions in writing and discuss them with his fellow jurors. (See *Elam*, *supra*, 91 Cal.App.4th at p. 316 [it is improper to remove a juror for perceived language difficulties if, "with repeated explanations and discussions," the juror ultimately "could comprehend matters"].)

Similarly, Juror No. 6's statement that due to his misgivings about his ability to comprehend English he might adopt another juror's conclusion about "what is right, what is wrong" does not support his removal. At the time the court removed Juror No. 6, it had yet to instruct the jury with CALCRIM No. 3550—which told the jury that in attempting to reach a unanimous verdict, each juror "must decide the case for [himself or herself], but only after you have discussed the evidence with the other jurors"—and it never admonished Juror No. 6 that the law required him to reach his own conclusions about the case. Moreover, as I noted, because the court removed him before deliberations, Juror No. 6 never had the opportunity to review the written instructions, ask for readback of any testimony he didn't understand, or discuss the case with the other jurors. It is entirely possible on this record that, after

4

having had the opportunity to participate in deliberations, Juror No. 6's doubts about his ability to reach his own conclusions about the case would not have manifested themselves.

Viewing the whole record, I am not confident that Juror No. 6 lacked sufficient proficiency in English to fully understand the evidence and instructions. Without the court taking further steps to ascertain the extent of Juror No. 6's ability to understand and communicate in English—such as by asking specific questions to probe the extent of the juror's English comprehension, or allowing the juror to review the instructions in written form or allowing him the opportunity to ask for readback of testimony— his removal was premature because the record does not establish as a demonstrable reality that Juror No. 6 in fact lacked the English language skills necessary to fulfill his duties as a juror. (See *Elam*, *supra*, 91 Cal.App.4th at p. 318.) Put differently, the court's efforts to ascertain whether Juror No. 6 understood the proceedings and testimony were minimal, and the record developed by the court's inquiry does not manifestly support its decision to discharge the juror at that point in the trial. And a mere possibility of a language deficiency does not justify the removal of a sitting juror under the heightened "demonstrable reality" standard. (See *Compton*, *supra*, 6 Cal.3d at p. 60 [any ambiguity in the juror's competency to serve on the jury must be resolved by proof]; *People v. Lucas* (1995) 12 Cal.4th 415, 489 [in deciding whether to remove a juror, the court cannot presume the worst about the juror's competency].)

Although I am sympathetic to the quandary facing the court in this case, and appreciate the gravity of defendant's crimes, the record simply does not support, as a demonstrable reality, a conclusion that Juror No. 6 lacked sufficient proficiency

in English to understand the evidence and the instructions. I would therefore reverse the judgment and remand the matter for retrial. (See *Armstrong, supra,* 1 Cal.5th at p. 454.)


LAVIN, Acting P. J.

000001

Your honor so sorry to take part of your beesy time I'm jury # 2559 If I can talk to you in private for a few minutes pleace, What I want to talk to you is about what I Told you the firt day of selection of jury about my English im very confuse about anderstanding so many words I never use or hear before and I think if I dont know them I can't be fair to this case if you let me explaine more of this to you thank you very much.

Juror # 2559

(seat 6)